Charles D. BENDER, Plaintiff-Appellant,

v.

HEARST CORPORATION, Defendant-Appellant.

No. 20, Docket 25016.

United States Court of Appeals
Second Circuit.

Argued Dec. 10, 1958.

Decided Feb. 11, 1959.

Lewis E. Caplan, New Haven, Conn. (Dennis N. Garvey, Richard A. Dice, John W. Colleran and Caplan & Garvey, New Haven, Conn., on the brief), for plaintiff-appellant.

Lawrence V. Brock, New York City (McCauley, Henry & Brennan, on the brief), for defendant-appellant.

Before CLARK, Chief Judge, and HINCKS and LUMBARD, Circuit Judges.

LUMBARD, Circuit Judge.

These are cross appeals from a judgment of the District Court for the District of Connecticut, Anderson, J., (1) awarding plaintiff $87,500 on his claim advanced in counts 1 and 2 of the complaint that the defendant tortiously induced one Reidl to commit a breach of an exclusive distributorship contract with plaintiff, and (2) awarding judgment to defendant on plaintiff's claim for treble damages under the antitrust laws for alleged violations growing out of the same transaction. The primary question presented on the defendant's appeal is whether and to what extent a distributor under the law of Wisconsin may recover damages from a third party who buys out his supplier with knowledge of a resulting breach of the exclusive distributorship agreement. There are subsidiary questions of the validity of the distributorship contract under the governing substantive law of Wisconsin. We hold that the facts as found by Judge Anderson, in his excellent opinion below, are supported by the record, and that under the law of Wisconsin the defendant's acts constituted an unprivileged invasion of the plaintiff's interest in the protection of his contract.

The third and fourth counts of the complaint alleged claims for treble damages under § 4 of the Clayton Act, 15 U.S.C.A. § 15 based separately on §§ 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2, and § 7 of the Clayton Act, 15 U.S.C.A. § 18. The primary question presented by the plaintiff's appeal on the Sherman Act claims is whether the district court correctly defined the relevant market to determine the existence of an unreasonable restraint of commerce. We hold that the market was correctly defined and that the record supports the findings upon which Judge Anderson rested the conclusion that there was no unreasonable restraint. We do not reach the issues presented by the defendant's contention on the claim under § 7 of the Clayton Act that Crash Book Sales, Inc., the transferor of assets to the defendant Hearst Publishing Co., was not a corporation within the meaning of that statute, because we find that the plaintiff has failed to show that private injury resulted from the merger even if it was unlawful.

## I—The Facts

The facts stated in the opinion below are amply supported by the record. We repeat here only so much as is necessary to our disposition. Until 1953 the plaintiff, Bender, was an automobile damage appraiser. In December of that year he became a part-time distributor of a loose-leaf reporting service known as Crash Book Service which provided insurance companies, damage appraisers and automobile repair shops with data on the current costs of automobile repairs conveniently displayed in loose-leaf form. The copyright covering the book was held by one Reidl, who traded under the name Crash Book Service. In October 1954 the plaintiff was persuaded by Reidl to give up all other employment and enter an agreement to act as a full-time exclusive distributor of Crash Book Service in an area of the United States generally comprised of the New England and Middle Atlantic States. By October 10, 1956 when this agreement was terminated by the acts of Reidl and the defendant, plaintiff employed three full-time and twenty part-time assistants in the distribution of Crash Book Service.

The distributorship agreement was partly established by letters and partly by oral conversations. It was primarily drafted by Reidl, who, by a letter in September 1955 attempted to integrate it. It included representations by Reidl that by plowing back into the distributorship the commissions on initial sales the plaintiff would profit, in the manner of insurance salesmen, from renewal commissions after a base of initial sales had been established in the first few years. The plaintiff acted upon these representations so that by September 30, 1956, after two years of full-time work, he had sustained a cash loss of a few hundred dollars, but had accounted for more than 3,000 sales, about one half of all sales of Crash Book Service. The

agreement also provided prices to the distributor and for resale and certain wholesale discounts. Under it the plaintiff secured a commission of $10 on most initial sales and $5 on renewals, with smaller amounts on bulk sales.

The plaintiff's territory was defined, and it was provided that the agreement would continue in force so long as the distributor remained active in the territory, with activity measured by the maintenance of a reasonable number of subscribers. On the distributor's wrongful conduct all of Reidl's obligations under the contract were to cease, but if the distributor withdrew voluntarily and without wrongful behavior provision was made for him to receive the benefits of the contract for one year. If the distributor died payments were to be made to his family for two years. There was no express provision for the withdrawal of Reidl.

Crash Book Service competed with four previously established publications, three of which were distributed nationally and the fourth primarily in the western states. One of the national publications was defendant's Motors Body Shop Flat Rate and Parts Manual (Motors Manual). Because of certain novel advantages of the display of information provided by Crash Book Service, and because of its monthly supplementation, it proved to be highly saleable. By October 1, 1956 the national circulation of Crash Book Service, the sole publication offered by Reidl, was approximately 7,000 as against 58,000, 10,000, 10,000 and 7,500 for its competitors, which were sold as part of lines consisting of a number of publications of use to the automotive trade.

In March of 1956 Reidl, from motives not here material, formed a corporation under the laws of Wisconsin known as Crash Book Sales, Inc., to act as sole sales agent for Crash Book Service. However, the corporation's agency did not overlap the plaintiff's, and he continued to act as Reidl's sole distributor in his exclusive territory.

In March 1956 the defendant Hearst determined that its publication, Motors Manual, was no longer adequate. It decided to discontinue publication for the two years that would be required to revamp the publication in order to incorporate the advantages that had been suggested by Reidl's design. To avoid the undesirable competitive consequences of a withdrawal of part of its multiple line of publications from the market for so long a time, the defendant, a publisher with large resources, finally decided to attempt negotiations with Reidl looking to the purchase of his Crash Book Service and its incorporation in the defendant's line in place of Motors Manual.

At about the same time Reidl became concerned over the future of Crash Book Service because of seemingly reliable rumors that the defendant and others were undertaking revisions of their manuals to incorporate the Crash Book Service advantages, and because these competitors, with their national distribution systems and multiple publications, might prove too much for the small new organization handling Crash Book. The negotiations commenced in May 1956 and resulted in the execution of a written contract for the sale of Crash Book Service to Hearst, executed at Milwaukee, Wisconsin on September 25, 1956, under which Reidl received $42,500 in cash, a contract of employment as editor of the service, and a royalty of 50¢ on all future sales of Crash Book for ten years up to $100,000.

Defendant knew of Reidl's contract with the plaintiff and was familiar with its terms as well as with the sales and renewals achieved by plaintiff in his territory. Defendant, as part of the inducement held out to Reidl, agreed to defend him against any suit that Bender might bring, and to reimburse him for any recovery up to $2,500. By this and other inducements Hearst persuaded the reluctant Reidle to repudiate his contract with plaintiff. By the terms of its contract with Reidl, defendant became entitled to receive the profit on subsequent renewals of outstanding subscriptions, and

on October 11, 1956 the defendant took steps to protect this interest by notifying plaintiff's customers that they were thereafter to deal only with its salesmen. After August 31, 1956 the plaintiff was neither paid nor credited with any of the profit due him on renewals, which averaged 80% of original sales.

## II—The Tort Claim

■■ As this cause of action arises under state law, the district court was obliged under the rule of Klaxon Co. v. Stentor Elec. Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, to apply the law that would have been applied by the Connecticuit courts. Under the conflict of laws rules of Connecticut, the substantive law of Wisconsin, the place where the tort occurred, was properly applied, see, e.g., Commonwealth Fuel Co. v. McNeil, 1925, 103 Conn. 390, 130 A. 794, since it was there that the defendant approached Reidl to purchase Crash Book Service, and it was there that the contract of sale was signed.

As to the tort claim, three questions are presented. (1) Was there a contract between Reidl and the plaintiff? (2) If a contract existed, was it breached by Reidl's sale of the business including the right to receive renewal commissions upon renewals of prior subscriptions? (3) If a valid contract was breached, was Hearst's conduct in inducing Reidl to sell privileged?

We agree with Judge Anderson that without a privilege to do so Hearst induced Reidl to breach a valid and existing contract with the plaintiff. We therefore need not consider a fourth question which was argued, namely, whether, even if the relationship between Reidl and plaintiff was at will, the defendant's act of procuring its termination was tortious.

■ (1) In order for the plaintiff's claim to be founded upon inducement to the breach of his contract, it is necessary to find that a valid contract between Reidl and the plaintiff existed at the time. The record amply supports the district court's conclusion in Finding of Fact #9 that the parties agreed upon the orally modified terms of the letter from Reidl to plaintiff of April 20, 1955, and that their agreement continued to the date of the alleged breach. The oral modifications referred only to the plaintiff's exclusive sales territory. That the plaintiff continued to bargain about the terms proposed by the letter is not evidence of his rejection of an offer, but rather of his acceptance of its substance with adjustment of details. His subsequent offer to sign the letter was sufficient to conclude the agreement, and Reidl's statement that signing was "not necessary" was on these facts assent to an oral contract, not rejection of it. Furthermore, the district court found that this contract was created without formal attempts to integrate it when the plaintiff undertook on October 1, 1954 to become a full-time distributor for Reidl, and we think that the record supports this conclusion.

The defendant argues that notwithstanding the intention of the parties to enter into a contract, the agreement reached was void under Wisconsin law either for want of "mutuality" or for lack of consideration. Although the Wisconsin cases involving distributorship, requirements, and output contracts do not appear to have clearly distinguished between the concepts of mutuality and consideration, see Note, 31 Col. L.Rev. 830 (1931), in our opinion the Wisconsin courts would not hold a contract such as this to be void. In the cases relied on by the defendant to establish voidness for want of mutuality, the contract failed to obligate the distributor to purchase or distribute any of the manufacturer's product, while it did obligate the manufacturer to supply the distributor despite his failure to sell. See, e.g., Hoffman v. Pfingsten, 1951, 260 Wis. 160, 50 N.W.2d 369, 26 A.L.R.2d 1131; Halvorson v. Tarnow, 1950, 258 Wis. 11, 44 N.W.2d 577; Strauss v. Eulberg Brewing Co., 1947, 250 Wis. 579, 27 N.W.2d 723; Pessin v. Fox Head Waukesha Corp., 1939, 230 Wis. 277, 282 N.W. 582.

In Hoffman v. Pfingsten, supra, the Wisconsin court characterized the requirement of mutuality of obligation as follows:

"In Hoffman's case there is no reference in the contract to * * * the requirements * * * which will determine the quantity of dressing which he will be bound to take and pay Pfingsten for. If Pfingsten should be dissatisfied with Hoffman's orders * * * we can find no relief in the contract for him. The original obligation for Hoffman to take 25,000 bottles monthly was struck out and nothing was put in its place." 50 N.W.2d 372.

The contract had originally provided:

" * * * in the event that party of the second part is not able to sell at least 25,000 bottles per month at the end of two years, then this contract shall become null and void, and parties of the first part shall have the right to engage another distributor." 50 N.W.2d 370.

and the court concluded that:

"There was mutuality of obligation while that provision remained * * *"

■■ In this case, while the plaintiff was not obligated to purchase or distribute a precise number of manuals, it was provided that:

"The agreement will remain in force so long as the distributor remains active in his territory. Activity shall not be determined by the amount of effort or time devoted to the sale of Crash Book Service, but by development and the maintenance of a reasonable number of subscribers."

Read in the light of the correspondence between Reidl and Bender defining their mutual expectations as to the number of subscribers, this obligation is sufficiently definite to serve as a measure of the duration of the publisher's duty to supply his distributor, and therefore to supply the mutuality of obligation required under Wisconsin law. See E. L.

Husting Co. v. Coca Cola Co., 1931, 205 Wis. 356, 237 N.W. 85, 238 N.W. 626, 84 A.L.R. 22. Furthermore, the contract also provided that "it shall be your responsibility to promote the sales of Crash Book Service through your own direct efforts and the employ [sic] of salesmen to sell under your jurisdiction." This clause appears to be an express covenant by the distributor to use his best efforts to attain a reasonable number of sales, and would be sufficient to found an action for breach. Cf. Wood v. Lucy, Lady Duff Gordon, 1917, 222 N.Y. 88, 118 N.E. 214.

■ Nevertheless, relying upon another clause of the contract, defendant argues that because it afforded the distributor an unrestricted right to terminate at will, in effect to order nothing at all, his promise was illusory, it could not serve as consideration for the publisher's promise to sell, and the contract lacked mutuality of obligation. The clause states:

"In the event the distributor shall wish to disassociate himself from this agreement by voluntarily making known his wishes or through inactivity * * * then, in that event, Crash Book Service will abide by the terms of this contract for one year from the time that the disassociation has become evident and notice of the action to be taken has been given."

Under the cases above cited a serious question of the enforceability of the agreement might have existed while it was wholly executory or before any substantial number of sales had been made. But the agreement here was no longer executory, and in order to exercise his power of termination under this clause after his partial performance the plaintiff would have had to forego all commissions on renewals except for those occurring in the first year after termination. Renewals normally were sold to 80% of the existing subscribers. Such a detrimental limitation on Bender's freedom of action under the clause is sufficiently similar to the detriment held

sufficient in Wisconsin cases sustaining agreements to purchase the requirements of an established business, although the buyer might discontinue his business, to lead us to believe that after the substantial performance the plaintiff has rendered the Wisconsin courts would find sufficient consideration and mutuality to sustain this agreement. See e.g., Excelsior Wrapper Co. v. Hessingen, 1903, 116 Wis. 549, 93 N.W. 459; Eastern R. R. Co. v. Tuteur, 1906, 127 Wis. 382, 105 N.W. 1067; see also Pessin v. Fox Head Waukesha Corp., supra ("Those circumstances add a measure of certainty sufficient to give the contract mutuality."). As a result of his substantial performance under the agreement the plaintiff accrued the considerable value of renewal commissions and conferred future benefits on Reidl from increased circulation, which benefits Reidl expressly sought by persuading the plaintiff to forego initial commissions. That the parties bargained with regard to the value of growth of the business and the likelihood of renewals there can be no doubt, since the contract expressly dealt with both matters.

■ (2) Hearst argues that even if there was a contract, that contract was not breached because the following clause permitted Reidl to terminate the agreement at will:

> "Crash Book Service will deliver * * * the distributor manuals necessary to * * * operation with the following limitations, said limitations being necessitated by unforeseeable contingencies. Crash Book Service assumes no liability for delay in or failure to provide * * * manuals * * * regardless of the reasons for failure to provide you with such materials. Further, Crash Book Service will not * * * be * * * liable for any loss and/or damage resulting from delay in or failure to deliver * * * manuals or materials regardless of how or why the delay or failure to deliver may occur."

We note first that the construction urged by the defendant would render Reidl's promise illusory if we were to adopt it. See Hoffman v. Pfingsten, supra; Pessin v. Fox Head Waukesha Corp., supra. Since read in the light most favorable to the defendant's contention the clause is at best ambiguous, we apply the rule of construction uniformly applied by the courts of Wisconsin, by which an ambiguous clause is construed strictly against the drafter and in favor of the validity of the agreement. Deree v. Reliable Tool & Machine, Inc., 1946, 250 Wis. 224, 26 N.W.2d 673.

■ But even without so strict a view of the language, the deliberate sale of a prosperous business in order to reap a large profit in cash and a profitable employment can hardly be thought to fall within the limitation of "unforeseeable contingencies" prescribed by the clause itself to define the scope of its application, particularly where, as here, the sale price to Hearst is in part geared to the future success of the continuing business. Further, apart from the self-limiting character of the clause, we agree, in the absence of contrary Wisconsin authority, with the reasoning of the California court in Milton v. Hudson Sales Corp., 1957, 152 Cal.App.2d 418, 313 P.2d 936, which in turn relied on a prior opinion of this court in which, construing a clause of greater breadth than the one involved here, we stated:

> "All that the clause meant was * * * an excuse for non-performance, to be exercised bona fide, not a privilege to repudiate."

Jay Dreher Corp. v. Delco Appliance Corp., 2 Cir., 1937, 93 F.2d 275, 277. See E. L. Hustings Co. v. Coca Cola Co., supra.

This construction is peculiarly applicable here, since the construction urged by the defendant would render all of the elaborate provisions of the contract for termination ineffective at the will of the publisher.

■ Defendant argues finally that even if the contract did not expressly give Reidl the right to terminate it at

will, it is a familiar doctrine of contract law that a manufacturer who agrees to supply an article to a distributor, even to do so for a particular length of time, does not thereby covenant that he will not terminate his business, see, e.g., Fidelity Ins. Agencies v. Citizens Casualty Co., 7 Cir., 1952, 194 F.2d 43, and therefore Reidl's termination of the plaintiff's interest by sale of the business to Hearst did not involve a breach of the contract. So general a proposition cannot be sustained. While many cases have held that termination by sale is not a breach, they have each determined that the sale of the business was done in "good faith," which has generally, although not uniformly, meant that the owner was unable to continue in business profitably. See, e.g., William S. Gray & Co. v. Western Borax Co., 9 Cir., 1938, 99 F.2d 239. We have been referred to no case in Wisconsin or elsewhere which has permitted a manufacturer to sell a profitable operating business and to divert to himself profits upon which his distributor was persuaded to rely, on the ground that no covenant to remain in business would be implied. Reidl of course was obligated to deal with the plaintiff in good faith, and we hold that the sale to Hearst without protection of the plaintiff's interest in his distributorship was not a sale in good faith, and was, as the district court found, a breach of his contract.[1]

■■■ (3) These latter considerations dispose of Hearst's claim that its inducement to Reidl to commit a breach of his agreement was privileged. Hearst claims that it did not seek the plaintiff's distribution business, but instead sought only to replace a manual whose publication it was forced to suspend with a new and more promising one; that its interest as a publisher was an independent business interest of equal dignity with the plaintiff's; that it did not seek to injure the plaintiff; that therefore the law will not choose between it and the plaintiff, but will hold its assertion of its interest in the acquisition of a new publication privileged. This argument ignores the fact that Hearst deliberately appropriated to itself the commissions on renewals which were the plaintiff's primary profits from his past efforts. Such an appropriation is not "incidental" to its acquisition of a new publication, whose established renewal rate was 80%, and one-half of whose sales had been made by the plaintiff. As against this plaintiff Hearst stands in no better shoes than would a distributor who had persuaded Reidl to transfer distribution to him. See, e.g., E. L. Hustings Co. v. Coca Cola Co., supra; Singer Sewing Machine Co. v. Lang, 1925, 186 Wis. 530, 203 N.W. 399. Finally, as recently as 1956 the Wisconsin Supreme Court has held that the "malice" which will subject a defendant to liability may be implied from his knowledge of the plaintiff's contract. Sweeney v. Stenjem, 1956, 271 Wis. 497, 74 N.W.2d 174 and cases cited.

■■ (4) Defendant's last objection is that the district court improperly applied a tort rather than a contract measure of damages. Even if we were to assume with the defendant that such sparse authority as there is supports his contention that the plaintiff's expectation of future profit would not be the contract measure of damages in Wisconsin, we would nevertheless sustain the award below. As the defendant concedes, Wisconsin has, in cases of tortious inducement to breach of contract, applied the tort rather than the contract measure. See, e.g., McClennan v. Church, 1916, 163 Wis. 411, 158 N.W. 73. There is ample support in the record for the district court's conclusion that the defendant's act manifested sufficient disregard of the plaintiff's rights to ren-

1. We are aware that this action presents several difficult questions of the validity and construction of the plaintiff's contract. Following the clear trend of the Wisconsin cases we have resolved such doubts as we have against the intermeddler. See, e. g., Bitzke v. Folger, 1939, 231 Wis. 513, 286 N.W. 36; E. L. Hustings Co. v. Coca Cola Co., 1931, 205 Wis. 356, 237 N.W. 85, 238 N.W. 626, 84 A.L.R. 22 (court did not consider question of validity of underlying contract).

der it liable for the gain plaintiff would have reaped during the foreseeable continuance of the business. In the light of the care with which Judge Anderson measured the damages awarded, we cannot agree with the claim that they were speculative.

### III—Sherman Act, § 1

On the claim advanced under § 1 of the Sherman Act[2] plaintiff rests his appeal on the ground that the district court incorrectly defined the relevant market to encompass too large a geographical area, and that this error rendered erroneous its otherwise proper determination that no unreasonable restraint of the market resulted from the transactions in suit. We find that the market was properly defined, and that the findings and conclusions below on which the absence of an unreasonable restraint was based are correct.

The district court found in its opinion that [152 F.Supp. 577]:

"The area of effective competition between * * * Crash Book Service and * * * Motor Body [&c.] * * * consisted of those states in the plaintiff's distributorship territory, the remaining portions of states a part of which was in the plaintiff's territory, and Arizona, Colorado, Florida, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Ohio, Tennessee, Texas and Wisconsin. * * *"

In Finding of Fact No. 16 the court found further that approximately one-half of the total sales of Crash Book Service to October 1, 1956 were made outside the plaintiff's territory. These findings are supported by the record. Plaintiff nevertheless contends that the relevant market here was a "prime market" supposedly represented by the area included in his former exclusive sales territory, and contends that the district court's allegedly improper definition of the market necessarily affects the de-

termination that no unreasonable restraint resulted. We find that the district court correctly defined the relevant market.

The defendant and Reidl competed before the merger in the entire area of Crash Book's circulation, since the defendant's manual was distributed nationally. There is nothing to indicate that the only area of genuine competition, or even that the primary area of competition was within the plaintiff's sales territory, rather than in all the territory which Reidl sought to exploit. For example, there was neither allegation nor proof that "purchasers cannot, as a practical matter, turn to suppliers outside their own area," Standard Oil Co. v. United States, 1949, 337 U.S. 293, note 5, 69 S.Ct. 1051, 1055, 93 L.Ed. 1371. To the contrary, the record shows that in general purchasers often had more than one manual in their libraries, and that the manual chosen by a purchaser depended upon its desirability and not at all upon factors relating to the geographical location of the seller or mode of distribution of the product. It thus appears that buyers purchased in a national market, not a particular local area, while publishers sold wherever a buyer could be found.

These facts dispose of the plaintiff's reliance here on Indiana Farmer's Guide Publishing Co. v. Prairie Farmer Publishing Co., 1934, 293 U.S. 268, 55 S.Ct. 182, 79 L.Ed. 356, where the Supreme Court reversed a defendant's judgment which had been sustained by the court of appeals on the ground that measured in a national market there was no unreasonable restraint of trade. The Supreme Court's choice of the local market depended upon a salient fact recited in the opinion, and entirely absent from the record here:

"[P]etitioner * * * was a publisher * * * of one or more farm papers. Each is a general, and not a vocational, paper; the larger

---

**2.** No challenge is made to the district court's disposition of the claim asserted under § 2 of the Sherman Act, and we therefore do not discuss it.

**370**

part of its circulation is in the State where printed; it does not circulate in any substantial number throughout the country as a whole and is called a state or sectional paper in order to distinguish it from publications having a wider and what is referred to as a national circulation. * * * " 293 U.S. 272, 55 S.Ct. 183.

It was thus alleged that the essentially local businesses of the plaintiffs were injured by the defendants' combination to offer reduced rates to advertisers buying space in all of the defendants' five sectional papers serving the same local area, and the Supreme Court found that the business fact alleged was sufficient to define a local or less-than-national market.

Plaintiff appears at times ready to maintain that his exclusive territory defines local market area within the Farmer's Guide case because he himself was formerly in competition with defendant's salesmen. But plaintiff is not a publisher; he is merely one of many conduits to the consuming public from a publisher, who is in substantially national competition with other publishers. There is no proof whatever of an unreasonable restraint of a separate competitive enterprise of distribution in the plaintiff's former sales area which would render that restricted geographical market relevant.

### IV—Clayton Act, § 7

Although we affirm the district court's dismissal of the claim based on § 7 of the Clayton Act [3] alleging a wrongful transfer of corporate assets by Crash Book Sales, Inc., to Hearst Publishing Co., we find that on the undisputed facts the plaintiff has failed to assert or prove a private injury, and we consequently do not consider the defendant's contention here that the assets transferred by Crash

Book Sales, Inc. were not corporate assets within the meaning of § 7 of the Clayton Act.

It is uncontested that when Crash Book Sales, Inc. was formed to act as exclusive sales agent for Crash Book Service the territory transferred to it by Reidl did not include the plaintiff's territory, and that the plaintiff continued to serve as Reidl's exclusive distributor in the territory agreed upon. Therefore even if we assume that Crash Book Sales was a corporation within the meaning of § 7 and that it did make a prohibited transfer of assets, the termination of plaintiff's distributorship, which is the only injury alleged or proved, could not have resulted from any act of the corporation. Thus plaintiff has failed to prove a private injury.

Affirmed.

3. 15 U.S.C.A. § 18 (as amended 1950)

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."