**JULIUS M. AMES CO. and Independent Pennsylvania Nail Co., Plaintiffs,**

v.

**BOSTITCH, INC., Defendant.**

United States District Court
S. D. New York.

March 8, 1965.

Dickstein, Shapiro & Galligan, New York City, for plaintiffs. David I. Shapiro, New York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for defendant. William Eldred Jackson, Isaac Shapiro, New York City, of counsel.

McLEAN, District Judge.

This is a private antitrust action in which plaintiffs charge that defendant has violated Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 7 of the Clayton Act (15 U.S.C. § 18). The two charges are not separately stated but are commingled in one count. Defendant moves under Rule 12(b) (6) to dismiss the Clayton Act charge on the ground that the complaint fails to state a claim. It also moves under Rule 56 for summary judgment dismissing the Sherman Act charge on the ground that it has no foundation in fact.

The allegations of the complaint may be summarized as follows:

Plaintiffs are engaged in the business of distributing metal fastener devices and products. Defendant is engaged in the business of manufacturing and selling machinery and devices for wire stitching, stapling, tacking and fastening, as well as wire, staples and related articles used with this machinery. It sells its products through subsidiary and affiliated companies.

Prior to April 1, 1961, Calwire, Inc. ("Calwire") was a California corporation engaged in manufacturing a heavy duty pneumatic industrial nailing tool, and nails and staples to be used with it. Calnail, Inc. ("Calnail") was its exclusive sales agent. Calnail owned all the stock of Calwire. Calnail distributed its products through independent distributors, two of whom were the two plaintiffs.

On April 1, 1961, defendant entered into an agreement with the owners of the stock of Calnail, pursuant to which defendant acquired that stock, Calwire was merged into Calnail, all "pre-existing arrangements" for the distribution of Calnail products by plaintiffs were cancelled, and defendant and its subsidiaries and affiliates took over the distribution of Calnail products.

Defendant was the "principal and dominant" manufacturer of metal fastening devices and products in the United States, and Calnail was "the dominant factor" in its "product market." Defendant's acquisition of Calnail has had "adverse competitive effects" in the market for heavy duty pneumatic industrial nailing tools. It violates Section 7 because it may have the effect of substan-

tially lessening competition or tending to create a monopoly in the manufacture and distribution of heavy duty pneumatic industrial nailing tools in the United States.

Defendant has also violated Section 1 of the Sherman Act in that it has conspired with its own sales subsidiaries and affiliates and with Calnail and Calwire, and has, in concert with them, refused to deal with plaintiffs and other former Calnail distributors. Plaintiffs have been damaged in their business and property by these violations in that (a) they have been prevented from distributing Calnail products, and (b) they "have been and will continue to be unable to compete" with defendant and its subsidiaries "in the distribution and sale of heavy duty pneumatic industrial nailing tools, and nails and staples" used therewith. The relief asked is treble damages in the sum of $1,800,000 for each plaintiff and a decree requiring defendant to divest itself of the stock and business of Calnail.

I will first consider defendant's motion under Rule 12(b) (6) addressed to the Clayton Act charge. Defendant expressly assumes, for the purposes of this motion only, that the acquisition of Calnail by defendant was a violation of Section 7. Its contention is that nevertheless the complaint fails to state a claim for relief because no private individual may sue for damages which he has suffered as a result of a violation by a defendant of Section 7, and no private individual, as distinct from the United States, may seek a decree requiring defendant to divest itself of the assets illegally acquired.

■■ Section 4 of the Clayton Act (15 U.S.C. § 15) provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may sue for treble damages. The Clayton Act is an "antitrust law." (15 U.S.C. § 12) Logically, it follows inevitably that a person injured by reason of anything forbidden in the Clayton Act may sue for treble damages.

Defendant attacks this syllogism on the strength of three decisions which appear to have rejected it. First is a decision of Judge Metzner at pre-trial, in Gottesman v. General Motors Corporation, 221 F.Supp. 488 (S.D.N.Y.1963), leave to appeal denied, unreported (Jan. 31, 1964), cert. denied, 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88 (1964). That was a derivative stockholders' action by stockholders of General Motors Corporation against General Motors and du Pont seeking damages allegedly sustained by General Motors as a result of the acquisition by du Pont of General Motors stock which was condemned in United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). Plaintiffs charged violations of the Sherman Act as well as of Section 7 of the Clayton Act. In the course of an opinion ruling in advance of trial upon various questions of law, Judge Metzner said (221 F.Supp. at 493):

> "The test of a section 7 violation is whether 'there is a reasonable probability that the acquisition is likely to result in the condemned restraints.' United States v. E. I. du Pont de Nemours & Co., supra, 353 U.S. at 607, 77 S.Ct. at 884, 1 L.Ed. 2d 1057. Plaintiffs cannot be damaged by a *potential* restraint of trade or monopolization. There can be no claim for money damages for a violation of section 7."

Next is a dictum in Highland Supply Corp. v. Reynolds Metals Co., 327 F.2d 725 (8th Cir. 1964). That was an action for damages allegedly sustained by plaintiff by reason of defendant's violations of Section 2 of the Sherman Act and Section 7 of the Clayton Act. Defendant acquired the stock and assets of a manufacturer of aluminum foil. The acquired company subsequently reduced its prices. Plaintiff was a competitor of the acquired company. The district court dismissed the complaint, without leave to amend, on the ground, apparently, of the statute of limitations. The opinion of the Court of Appeals reversing the district court is devoted primarily to a dis-

cussion of the statute of limitations. In a footnote (327 F.2d at 728 n. 3), however, the court said:

"We think that any effort to convert Section 7 of the Clayton Act into a *per se* violation of the antitrust laws so as to give rise to a private right of action under the Clayton Act has been squarely checked by what is said by Mr. Chief Justice Warren in Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510. As interpreted in that case, Section 7 of the Clayton Act does not condemn all mergers, but only those having demonstrable anti-competitive effects. The statute deals with clear-cut menaces to competition, not with accomplished monopolies, presently creating damage to a competitor, which is the *sine qua non* of a private right of action under Section 5 [sic: Section 4] of the Clayton Act."

The third decision is Bailey's Bakery, Ltd. v. Continental Baking Company, 235 F.Supp. 705 (D. Hawaii 1964). That was an action for damages allegedly sustained by plaintiff by reason of defendant's acquisition of a bakery of which plaintiff was a competitor. The complaint alleged that the acquired company had engaged in various practices, i. e., selling at low prices, extensive advertising, etc., so that plaintiff could not successfully compete. The complaint charged violations of Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act. The court dismissed the complaint as to the Clayton Act charge for failure to state a claim. It said (235 F. Supp. at 716):

"Clayton § 7 is strictly an 'ounce of prevention' Act, based upon a 'may be' monopoly situation."

It went on to say that a plaintiff cannot recover for "anticipated invasions" of his rights and that (235 F.Supp. at 717):

"Since Clayton § 7 is concerned with the future monopolistic and restraining tendencies of corporate acquisition, * * * any damages claimed for prospective restraint of trade would be purely speculative, and a plaintiff cannot recover money damages for anticipated but unimplemented acts of restraint which may invade its interests."

Accordingly, the court held that:

"While Clayton § 7 permits private injunctive and divestiture actions in merger situations which may result in the proscribed restraints or monopolies, nevertheless, no private action for treble damages accrues from a Clayton § 7 acquisition."

The rationale of each of these decisions would appear to be this: At the time of the alleged acquisition, a lessening of competition or a monopoly need not already have occurred, for Section 7 is violated merely by the probability that such a lessening of competition or monopoly may occur in the future. Therefore, plaintiff is not injured at the moment of acquisition. His damage will occur, if at all, only in the future, when the lessening of competition or the monopoly actually manifests itself. Consequently, at the moment of acquisition, plaintiff's damages are purely speculative and hence he cannot recover.

■ In the case before me, however, a different situation is presented. Plaintiffs have lost their distributorships. They lost them, according to the complaint, substantially at the moment when defendant acquired Calnail. Since, by hypothesis upon this motion, the acquisition of Calnail was illegal, defendant's illegal act has caused plaintiffs immediate and present damage. I cannot escape the conclusion that plaintiffs are entitled to recover that damage. Section 4 says that any person who is injured by reason of anything forbidden in the "antitrust laws" may sue. It does not say that a person may sue if he is injured by reason of anything forbidden in the antitrust laws except that which is forbidden by Section 7 of the Clayton Act. I see no proper basis for reading such an illogical exception into the statute. See Note, 64

Columbia Law Review 597, 600–01 (1964).

There appears to be nothing in the legislative history of Section 4 or Section 7 which would justify such an exception.

It is well settled that the purpose of Section 4 is to make enforcement of the antitrust laws more effective by giving individuals an incentive to sue when they are injured by antitrust violations. The design of the act is that private and public actions are to be "cumulative, not mutually exclusive." United States v. Borden Co., 347 U.S. 514, 518, 74 S.Ct. 703, 98 L.Ed. 903 (1954).

It is also settled that Section 4 is not to be narrowly construed. The provision is basic to the effective enforcement of the antitrust laws. Monarch Life Ins. Co. v. Loyal Protective Life Ins. Co., 326 F.2d 841 (2d Cir. 1963), cert. denied, 376 U.S. 952, 84 S.Ct. 968, 11 L.Ed.2d 971 (1964)

To read into Section 4 the exception which defendant suggests would inevitably narrow the section and mitigate against its effectiveness.

No case has been found in which the question here presented has been expressly decided, other than the three cases heretofore mentioned. Nevertheless, some support for the views here expressed can be found, inferentially at least, in two decisions.

In Bender v. Hearst Corporation, 263 F.2d 360 (2d Cir. 1959), the facts were that one Reidl, an individual doing business as Crash Book Service, published a manual used in the auto repair business. Plaintiff was Reidl's distributor in a certain territory. A corporation known as Crash Book Sales, Inc., the stock of which was owned by Reidl, was Reidl's distributor in a different territory. Defendant acquired Reidl's business, including, apparently, the assets of Crash Book Sales, Inc. Defendant induced Reidl to cancel plaintiff's distributorship. Plaintiff sued, claiming, among other things, damages for violation of Section 7. Defendant contended that Section 7 was not applicable because the assets of Crash Book Sales, Inc. acquired by defendant were not assets of a corporation within the meaning of Section 7. In affirming the district court's dismissal of this claim, the Court of Appeals found it unnecessary to pass upon defendant's contention, for it held that since plaintiff was the distributor of Reidl individually, "the termination of plaintiff's distributorship, which is the only injury alleged or proved, could not have resulted from any act of the corporation." (263 F.2d at 370).

Here is a recognition that the termination of a distributorship is an injury. One may infer that if the distributorship in the Bender case had been granted to plaintiff by the corporation, the court would have thought it necessary to determine whether the corporation had made a transfer to defendant which was prohibited by Section 7, and that if it had, plaintiff could have recovered. There is no suggestion in the opinion that plaintiff's claim was insufficient on the theory here advanced that a private plaintiff may not maintain an action to recover such damages caused him by such a violation.

Further support, also implied rather than expressed, may be found in New Jersey Wood Finishing Co. v. Minnesota Mining and Manufacturing Co., 332 F.2d 346 (3rd Cir. 1964), cert. granted, 379 U.S. 877, 85 S.Ct. 146, 13 L.Ed.2d 85 (1964). That was an action for damages allegedly suffered by plaintiff because of defendant's violation of Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act, arising from defendant's acquisition of the stock or assets of another corporation. The question was whether the action was barred by the statute of limitations, or whether the statute was tolled by the provisions of Section 5(b) of the Clayton Act (15 U.S.C. § 16(b)) because of a previous action brought by the Federal Trade Commission against defendant charging that the acquisition violated Section 7. The court held that the statute was tolled. It affirmed the order of the district court denying defendant's motion to dis-

miss. The court specifically stated that "the Sherman and Clayton Acts upon violations of which N. J. Wood's complaint is based, are 'antitrust laws' within the meaning of Section 4." (332 F.2d at 350) Underlying the entire opinion is the fundamental assumption that plaintiff may maintain its action for damages for violation of Section 7 as long as the statute of limitations is not a bar.

Everything considered, I am unwilling to follow in this case the broad statements in the three decisions relied upon by defendant to the effect that there can be no claim for money damages for a violation of Section 7. I hold that the complaint sufficiently alleges that plaintiffs have been injured in their business and property by reason of conduct of defendant which is forbidden by Section 7 of the Clayton Act, and that these allegations state a claim upon which relief can be granted. Whether plaintiffs can prove such damages, or, for that matter, whether they can prove a violation, is, of course, something with which we are not concerned upon the present motion.

Defendant also maintains that a private party, as distinct from the government, may not secure a decree of divestiture.

Section 16 of the Clayton Act (15 U.S.C. § 26) provides that:

"Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title * * *." *

Divestiture is a form of injunctive relief. It may or may not be appropriate, depending upon the circumstances. In American Crystal Sugar Co. v. Cuban-American Sugar Co., 152 F. Supp. 387 (S.D.N.Y.1957), aff'd, 259 F. 2d 524 (2d Cir. 1958), relied upon by defendant, the district court denied divesti-

ture on the ground that it was unnecessary. The Court of Appeals did not mention the subject, doubtless because plaintiff did not appeal.

In Schrader v. National Screen Service Corporation, 1955 Trade Cas. ¶ 68,217 (E.D.Pa.1955), also cited by defendant, the court in its brief memorandum merely stated that it was generally recognized that "considerations of policy are against decreeing divestiture" in private actions.

Neither decision holds that divestiture may never be granted under any circumstances in a private action under Section 16. No case has been found that does so hold. I see no valid reason for accepting such a proposition. The statute does not distinguish between types of injunctive relief. Any type would seem to be permissible, when it is appropriate. The question of the nature and extent of the remedy to be decreed, in the event that plaintiff prevails, is a question for the trial court, to be determined after all the evidence is in. The court should not attempt to determine it in advance of trial upon a motion.

Defendant's motion under Rule 12(b) (6) to dismiss the Section 7 claim is denied.

I turn now to defendant's motion for summary judgment with respect to plaintiffs' claim of violation of Section 1 of the Sherman Act. The charge in the complaint in this respect is that defendant and its coconspirators, i. e., its own subsidiaries and affiliates and Calnail and Calwire, have in concert refused to deal with plaintiffs and "others similarly situated."

Defendant has supported its motion with an introductory affidavit of its attorney, and affidavits of two officers of defendant. Plaintiffs have not submitted any opposing affidavits. The parties have submitted to the court a number of pretrial depositions, exhibits thereto and answers to interrogatories, and each side points to the portions of these documents

---

* Section 18 "of this title" is Section 7 of the Clayton Act.

which it considers advantageous to its position.

Defendant's position is that defendant independently arrived at its decision to terminate plaintiffs' distributorships, that this decision was not the result of an agreement between defendant and Calnail, and that defendant had sound business reasons for deciding to distribute Calnail products through defendant's own organization. Plaintiffs contend, on the contrary, that defendant agreed with Calnail, prior to the acquisition, that Calnail would terminate plaintiffs' distributorships and that defendant would refuse to sell to plaintiffs, that pursuant to this agreement and before the acquisition was consummated, defendant and Calnail acting in concert, did terminate the distributorship, and that both before and after the acquisition, defendant refused to sell to plaintiffs.

The evidence on this subject, as far as it appears from the documents submitted, may be summarized as follows:

On January 25, 1961, defendant entered into a letter agreement with Gilmore, the principal stockholder of Calnail, to purchase all the stock of Calnail and Calwire for $500,000, to be paid on or before March 30, 1961. Gilmore agreed to indemnify defendant against all liabilities of either corporation not reflected upon their books as of February 28, 1961.

Defendant's officers say that before this agreement was made, they had decided between themselves that if defendant acquired Calnail and Calwire, defendant would distribute their products through defendant's own organization. They so informed Gilmore in the negotiations preceding the signing of the agreement of January 25, 1961. They asked Gilmore whether Calnail had any agreements for distributors which could not be terminated on 30 days' notice or less. Gilmore said that there were none. He so represented in the agreement of January 25, 1961.

It appears that sometime after January 25, 1961, just when is not certain, the form of the deal was changed so that instead of an acquisition by defendant of the stock of Calnail and Calwire, the arrangement was to be an acquisition by a wholly-owned subsidary of defendant, Bostitch Industrial Stapling Machine Co. ("Industrial") of the assets of the two Calnail corporations. There are references in later documents to an agreement to this effect which apparently was entered into between Calnail, Industrial and Gilmore and his wife, dated as of February 28, 1961, and apparently to be consummated on April 12, 1961. No copy of this agreement has been submitted to the court.

Defendant says that on March 1, 1961, defendant took over management and control of Calnail and Calwire, although the sale had not yet been closed. An officer of defendant says that this assumption of control was "pursuant to" the agreement of January 25, 1961. I find nothing in that agreement which expressly so provides.

On March 15, 1961, an official of Calnail wrote to plaintiffs stating that "the ownership and control" of Calnail and Calwire had been acquired by defendant. This statement was inaccurate, at least as far as ownership is concerned, for the purchase still had not been consummated. In this letter Calnail informed plaintiffs that their distributorships would be terminated as of May 1, 1961.

On April 6, 1961, defendant received a letter from the Federal Trade Commission stating that it was investigating in order to determine whether the proposed acquisition would violate Section 7 of the Clayton Act. Thereupon, on April 12, 1961 a "standby agreement" was entered into between Calnail, Industrial and Gilmore and his wife. The copy of this document submitted to the court is unsigned and incomplete, but it sufficiently appears that in it the parties agreed to postpone the closing of the transaction pending the outcome of the Federal Trade Commission investigation. They agreed that if the Commission should determine that the acquisition did not contravene Section 7, then the closing should

take place within fourteen days thereafter. It further provided that "in the event said Federal Trade Commission does not determine said acquisition does not contravene said Section 7 of the Clayton Act," the buyer should so inform the seller, all payments made on account should be refunded, and the agreement of purchase and sale should terminate without further obligation thereunder by any party.

Apparently for some months thereafter the deal remained in suspense. Defendant continued to manage and control Calnail, although it did not acquire ownership of it. Although the acquisition had been postponed, and was subject to cancellation under certain circumstances as noted above, the termination of plaintiffs' distributorships was not postponed, and they ceased to act as Calnail's distributors on May 1, 1961. Defendant refused to supply them with Calnail products.

On August 25, 1961, although the Federal Trade Commission had not reached any conclusion in its investigation of a possible violation of Section 7, and had not determined that the proposed acquisition was not such a violation, the parties, i. e., Industrial, Calnail and the Gilmores, entered into another agreement, which provided for the completion of the purchase immediately, the closing to take place on the very date of the agreement, August 25, 1961. The agreement provided that the buyer, Industrial, assumed all liabilities of Calnail and Calwire (which by that time had been merged into Calnail) as of February 28, 1961, and that the gain or loss from the operations of the companies after February 28, 1961 should be for the account of the buyer.

Defendant claims that these facts establish as a matter of law that defendant, acting independently, exercised its right of refusal to deal with plaintiffs, a right given it by United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). In considering its contention, one cannot close one's eyes to the fact that the doctrine of the Colgate

case has been in failing health for years, and may be found, when the question next arises in the Supreme Court, to have expired completely. As the Court of Appeals has pointed out, ever since United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960):

"The Supreme Court has left a narrow channel through which a manufacturer may pass even though the facts would have to be of such Doric simplicity as to be somewhat rare in this day of complex business enterprise." George W. Warner & Co. v. Black & Decker Mfg. Co., 277 F.2d 787, 790 (2d Cir. 1960)

■ If a way is to be found to negotiate this "narrow channel," the voyage will be safer and shipwreck more easily avoided if the passage is attempted at a trial rather than upon a motion. Upon this motion, the court cannot decide questions of credibility. It may be that a trial court, after hearing all the evidence, will accept the testimony of defendant's officers at full face value. If it does, it will have a solid foundation of fact upon which to determine whether the Colgate doctrine still protects defendant from a charge of Sherman Act violation in these circumstances. But at the present stage, the foundation is not as firm. Plaintiffs, it is true, under Rule 56(e) must make a showing of facts sufficient to require a trial. It may be thought that the showing here is weak. Still it does appear that there was at least cooperation between Calnail and defendant in cancelling plaintiffs' distributorships at a time when it was still possible that defendant would never acquire Calnail's assets. I doubt that I can say as a matter of law that a trier of the fact could not draw any inference which would contradict defendant's claim that the case should be treated as though defendant, all by itself, had terminated plaintiffs' distributorships after defendant's purchase of Calnail's assets had been consummated.

■ Moreover, the papers before me are manifestly incomplete. At least one document is missing and another is un-

signed. A Sherman Act case should not be disposed of summarily on such an imperfect record.

 This case must be tried in any event, on the Clayton Act charge. It should not protract the trial unduly if the trial court also decides the Sherman Act charge. I believe that such a course will lead to a sounder result.

Motion denied.

So ordered.