**TREADWAY COMPANIES, INC., et al., Plaintiffs,**

v.

**BRUNSWICK CORPORATION, Defendant.**

Civ. A. No. 595–66.

United States District Court, D. New Jersey.

Nov. 15, 1974.

As Amended Nov. 25, 1974.

Cole, Geaney & Yamner, Paterson, N. J., for plaintiffs; Malcolm A. Hoffmann, Robert C. Agee, Robert W. Biggar, Jr., and Bernard Zucker, New York City, of counsel.

Stryker, Tams & Dill, by William L. Dill, Jr., Newark, N. J., for defendant; Miles G. Seeley, Thomas B. McNeill, and Mayer, Brown & Platt, Chicago, Ill., of counsel.

## OPINION AND ORDER

WHIPPLE, Chief Judge.

The parties appear before this Court after having concluded a nine and a half week trial before a jury at which the defendant Brunswick was found to have violated Section 7 of the Clayton Act, 15 U.S.C. § 18. The jury found no violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. The plaintiffs were awarded damages by the jury in the amount of $2,358,030 before trebling and consented to a remittitur in the amount of $499,050 for the reasons set out in an opinion by this Court filed on September 17, 1973, Treadway Companies, Inc. v. Brunswick Corporation, 364 F.Supp. 316, 324–326 (D.N.J.1973). The relief presently sought by the plaintiffs is for an injunction pursuant to 15 U.S.C. § 16 and Fed.R.Civ.P. 65 ordering the defendant Brunswick to divest itself of Belmont Lanes, Pueblo, Colorado; Interstate Lanes, Ramsey, New Jersey; Fair Lawn Lanes, Fair Lawn, New Jersey; Ten-Pin-on-the-Mall, Paramus, New Jersey; and Lodi Lanes, Lodi, New Jersey.

In considering the propriety of this relief, the Court is mindful that the jury has already found injury and has awarded damages which, prior to Telex v. I. B. M., 367 F.Supp. 258 (N.D.Okl.1973), represented the largest outstanding, privately-litigated recovery under the antitrust laws of the United States. This Court is also reminded by the plaintiffs that, "[d]ivestiture has been called the most important of antitrust remedies. It is simple, relatively easy to administer, and sure. It should always be in the forefront of a court's mind when a violation of § 7 has been found." United States v. E. I. duPont de Nemours & Co., 366 U.S. 316, 330–331, 81 S.Ct. 1243, 1252, 6 L.Ed.2d 318 (1961).

For its part the defendant resists this motion for injunctive relief. It contends that before this drastic remedy may be ordered, the Court must specifically find, pursuant to the requirements of Fed.R.Civ.P. 65, in what manner the defendant violated Section 7 of the Clayton Act and whether divestiture is, in fact, a remedy effectively directed toward ameliorating the injury found by the jury to have been suffered by the plaintiffs. The defendant further argues that the factual cause of plaintiffs' damages may not be found by the Court independent of and unassisted by the jury's finding on the record already submitted. At this stage of the proceeding, the Court is reminded by the defendant that it operates under the restraint of an estoppel by verdict wherein the Court's findings must at least be consistent with the jury's verdict if such findings were not analytically contained therein. Dixie Sand and Gravel Corp. v. Holland, 255 F.2d 304 (6th Cir. 1958). As a result the defendant vigorously em-

phasizes the fact that the jury found no liability on the Sherman Act charge of attempted monopolization. The defendant argues that this finding must necessarily influence the Court in its factual determination concerning the defendant's Clayton Act violation.

Section 7 of the Clayton Act reads:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or *to tend to create a monopoly.* 15 U.S.C. § 18 [emphasis supplied]

Since the jury previously found for the defendant on the Sherman Act charge of attempted monopolization, the defendant reasons that the italicized language above must now be removed from the Court's purview. Therefore, the defendant's violation of Section 7 must fall within the alternative language of the statute and reflect activities on its part which have resulted in a substantial lessening of competition. The defendant closes its argument by entreating the Court, as it makes its findings of fact pursuant to Fed.R.Civ.P. 65, to discover and reveal those specific acts of misconduct by which the defendant produced the substantial lessening of competition required by the statute.

 Although linguistically interesting and possessed of a certain persuasive allure, I conclude that the defendant's argument is legally deficient. It fails to recognize that the test for attempted monopolization under *Section 2* of the Sherman Act involves, among other elements, the finding of a specific intent to monopolize. Times-Picayune Publishing Co. v. United States, 345 U. S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Swift and Company v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L. Ed. 518 (1905). No such finding of specific intent, however, is a necessary element for a conviction under the "tendency to create a monopoly" provision of Section 7 of the Clayton Act. As a result, the jury's Sherman Act determination does not preclude this Court from finding that its Clayton Act verdict was based upon a "tendency to create a monopoly." United States v. DuPont de Nemours & Co., et al, 353 U.S. 586, 607, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); Crown Zellerbach Corporation v. F.T.C., 296 F.2d 800, 825 (9 Cir. 1961), cert. denied, 370 U.S. 937, 82 S. Ct. 1581, 8 L.Ed.2d 807 (1962). It is also established, ". . . the legislative history of § 7 indicates clearly that the tests for measuring the legality of any particular economic arrangement under the Clayton Act are to be less stringent than those used in applying the Sherman Act." Brown Shoe Co. v. United States, 370 U.S. 294, 328–329, 82 S.Ct. 1502, 1526, 8 L.Ed.2d 510 (1962). The decision by the jury on defendant's alleged violation of the Sherman Act goes no further than what it appears to be on its facts and thus it bears no logical relationship to the Court's present task of making factual findings on the defendant's violation of Section 7 of the Clayton Act.

In making the present findings this Court places primary reliance on Reynolds Metals Company v. F.T.C., 114 U. S.App.D.C. 2, 309 F.2d 223 (1962) and the authorities cited therein. The *Reynolds* case is analogous to the case at bar. It concerned a vertical merger by Reynolds, the world's largest manufacturer of raw aluminum foil, with Arrow Brands, a converter of raw aluminum foil into decorated forms sold almost exclusively to the florist trade. The Court found:

Arrow's assimilation into Reynolds' enormous capital structure and resources gave Arrow an immediate advantage over its competitors who were contending for a share of the market for florist foil. The power of the

"deep pocket" or "rich parent" for one of the florist foil suppliers in a competitive group where previously no company was very large and all were relatively small opened the possibility and power to sell at prices approximating cost or below and thus to undercut and ravage the less affluent competition. The Commission is not required to establish that the Reynolds' acquisition of Arrow did in fact have anti-competitive consequences. It is sufficient if the Commission shows the acquisition had the capacity or potentiality to lessen competition. That such a potential emerged from the combination of Reynolds and Arrow was enough to bring it within Sec. 7. Reynolds Metal Company v. F.T.C., *supra*, 229–230 (1962).

Brunswick is a manufacturer of bowling equipment and its acquisition of these bowling lanes, which were potential and actual purchasers of its equipment, provided it with the opportunity of acting, like Reynolds, as a rich parent with a deep pocket. In Brunswick's case, however, the opportunity to tap the deep pocket did not prove merely to be a potentiality.

The history of the bowling industry and Brunswick's role in it is particularly illustrative on this point. Prior to Brunswick's entrance into the market of operating bowling centers, control of these businesses rested in the hands of single proprietors and a few small chains. One year after its entrance, however, Brunswick controlled 176 bowling centers in the United States and immediately became the industry's largest single operator controlling 5.5 times more centers than any of its competitors. (Pl.Ex. 32)

Its growth in this area, however, did nothing to diminish its prominence as a major manufacturer of bowling equipment and, incident thereto, its position as a major creditor to the bowling centers which purchased its equipment. As a credit-extending parent it was able to subsidize the purchases of its newly-acquired business at the rate of $2,000.00 per lane, (Pl. Exs. 1, 1A, 2) while it placed the plaintiffs on a "cash only" basis although prior to entry in this market it customarily extended credit to these plaintiffs (Pl.Ex. 35–38; Lieblich Tr. 598–601, 604–609, 617–628). Obviously the defendant utilized its position as a major supplier and creditor not only to nourish its own newly-acquired children but also to deprive its newly-found rivals.

This naturally jealous parent also sought to favor its newly-acquired businesses by endowing them with the allurements of give-away programs and special services as the Learn-to-Bowl series. The object was to attract and increase patronage of these bowling centers by individual bowlers and leagues. In this they were successful and drew patronage away from the plaintiffs. (Lieblich Tr. 290, 293–294, 321, 336–337, 389, 409–411, 873, 878–896, 899–901, 926–930; Kenny Tr. 1110–1111, 1126; Davis Tr. 1804–1812, 1818–1828, 1839–1843, 1869–1870; Mendelson Tr. 1243–1246, 1314, 1343–1346, Pl.Ex. 53). The deep pocket of the rich parent certainly contributed to the expenditures made on these programs.

It is obvious that the plaintiffs have suffered as a result of defendant's entry into the bowling center market. The jury also recognized the effect of this injury when it adopted plaintiffs' Exhibit 53 as its measure of damages on the Section 7 claims. This Court's own observations, coupled to the fact of the jury's own finding of injury on the Section 7 count, make it incumbent on me to fashion an equitable remedy to assure the nonrecurrence of such injury in the future. To act otherwise would have this Court violate the very doctrine of estoppel by verdict so vigorously advocated by the defendant both on oral argument and in its brief.

In fashioning this remedy, I find it necessary to expressly state the factual basis on which I shall make my ruling. Although I have specifically

made findings concerning the anti-competitive practices utilized by the defendant in causing the plaintiffs' injury, I also find in the alternative that the factual presence of the defendant in this market is sufficient to prompt the equitable intervention of this Court. In so finding, I adhere to the argument advanced by the plaintiffs that actual anti-competitive effects, let alone the causal mechanisms by which they were induced, are not necessary precedents to finding a violation of Clayton Section 7 nor to ordering equitable relief.

■ The mere presence of a defendant in the market with the capacity or potentiality to substantially lessen competition is sufficient to trigger a violation of Section 7. Reynolds Metals Co. v. F.T.C., *supra*, at 229–230. In the instant case, however, not only does this defendant possess the *potentiality* to substantially lessen competition (because of its dual capacity as a manufacturer, creditor and supplier of bowling equipment as well as a purchaser of the same) but also the jury has already found the *actuality* of this anti-competitive effect when it assessed its award of damages in favor of the plaintiffs. The very fact of the jury's finding, unless it was so erroneous as to demand a judgment n. o. v. which I have previously denied, is sufficient to support my present decision to order injunctive relief.

The sufficiency of the jury's finding to support an injunctive decree of divestiture does not automatically resolve all the issues presented in the plaintiff's present application. Although it is permissible for divestiture to be ordered in the instant case, the question remains concerning its wisdom. The cases indicate, at times, a judicial reluctance to order so drastic a remedy in a private antitrust action. Schrader v. National Screen Service Corp., 1955 Trade Case, Par. 68,217 (E.D.Pa.1955); and at times the courts seriously question whether such a right is available to private litigants under the antitrust laws. American Comm'l Barge Line Co.

v. Eastern Gas. Assoc., 204 F.Supp. 451 (S.D.Ohio 1962).

■ This Court's reading of Section 16 of the Clayton Act, however, does not find any Congressional reluctance nor prohibition of affording the remedy to a private litigant. The language of the more recent cases in this area also supports this interpretation of the statute. "In the absence of solid precedent or clear legislative history, this court's own research into the availability of divestiture and mandatory injunction to a private plaintiff suing under § 16 has impelled this court to conclude that both such equitable remedies are available to private plaintiffs under § 16." International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp., 351 F.Supp. 1153, 1207 (D.Hawaii, 1972); Burkhead v. Phillips Petroleum Co., 308 F.Supp. 120, 127 (N.D.Cal. 1970). "The statute does not distinguish between types of injunctive relief. Any type would seem to be permissible, when it is appropriate. The . . . nature and extent of the remedy to be decreed . . . is a question for the trial court . . ." Julius M. Ames Co. v. Bostitch, Inc., 240 F.Supp. 521, 526 (S.D.N.Y., 1965).

■ In ruling upon the appropriateness of the remedy the Court is influenced by a number of factors. Initially, it recognizes that private enforcement of the antitrust laws is encouraged both by Congress and the courts as an effective and efficient means of achieving governmental policy. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130–131, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944). A second but no less central factor is the need to restore competitiveness in the market as well as the actual need for relief by the plaintiffs. "Like restitution it merely deprives the defendant of the gains from his wrongful conduct. It is an equitable remedy designed in the public interest to undo what could have been prevented had the defendants not

outdistanced the government in their unlawful project." Schine Chain Theatres, Inc. v. United States, 334 U.S. 110, 128, 68 S.Ct. 947, 957, 92 L.Ed. 1245 (1948). Finally, as was previously observed at the outset of this opinion, it is a remedy which, " . . . is simple, relatively easy to administer, and sure. It should always be in the forefront of a court's mind when a violation of § 7 has been found." United States v. E. I. duPont de Nemours & Co., *supra*.

▮ As applied to the facts in the instant case, it is apparent that the defendant's position in the bowling industry both as a supplier-purchaser and a creditor-borrower has infused it with the capacity to out-distance the efforts of its rivals because of the deep pocket of its manufacturing arm. Whether this deep pocket should or should not be utilized to finance give-aways and other promotional schemes or to subsidize or not to subsidize the purchase of newer and more attractive bowling equipment, it is clear that the opportunity for the abuse of this economic power is ever present. For the Court simply to enjoin these particular methods of doing business would not prevent the defendant from possibly creating other means and practices by which the same anticompetitive effects could be produced in the market. In fact, it is this very anxiety about the versatility of an integrated giant and the multifarious ways by which it can abuse its economic power that has led this Court to refrain from basing its divestiture decree on narrow factual issues confined to those particular business practices that it has found to be anti-competitive in effect. The flexibility, afforded by the aggrandizement of economic power effected through the vertical merger in the instant case, is the actual danger that threatens both the bowling industry and these plaintiffs. This danger can effectively be removed only by rescinding the merger.

▮ Because the boundaries of this relief must be limited in extent to those zones of interest and actual harm properly represented by these plaintiffs, I shall order the defendant to divest itself of its bowling operations at Belmont Lanes, Pueblo, Colorado; Interstate Lanes, Ramsey, New Jersey; Fair Lawn Lanes, Fair Lawn, New Jersey; Ten-Pin-on-the-Mall, Paramus, New Jersey; and Lodi Lanes, Lodi, New Jersey.

The plaintiffs are to submit an appropriate order.