NBO INDUSTRIES TREADWAY COMPANIES, INC., et al.

v.

BRUNSWICK CORPORATION, Appellant in Nos. 74–2127, 75–1152, et al.

Appeal of PUEBLO BOWL–O–MAT, INC., et al., in No. 74–2128.

Nos. 74–2127, 74–2128 and 75–1152.

United States Court of Appeals, Third Circuit.

Submitted on Briefs April 1, 1975.

Decided Aug. 29, 1975.
Certiorari Granted Feb. 23, 1976.
See 96 S.Ct. 1101.

Bernard G. Segal, Ira P. Tiger, Joseph A. Tate, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for Brunswick Corp., appellant in Nos. 74–2127 and 75–1152 and cross-appellee in No. 74–2128; Miles G. Seeley, Thomas B. McNeill, Mayer, Brown & Platt, Chicago, Ill., of counsel.

Law Firm of Malcolm A. Hoffmann, New York City, for appellees in Nos. 74–2127, 75–1152 and for cross-appellants in No. 74–2128; Malcolm A. Hoffmann, Robert W. Biggar, Jr., Bernard Zucker, William B. Sneirson, Robert C. Agee, New York City, of counsel.

Before STALEY, GIBBONS and WEIS, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

### I. INTRODUCTION

We have before us appeals and cross-appeals from a final judgment entered in a private antitrust case. The following determinations in the district court are being challenged: (1) the finding of a violation of § 7 of the Clayton Act, 15 U.S.C. § 18; (2) the correctness of the trial judge's calculation of attorney fees and costs; and (3) the propriety of the trial judge's entry of a divestiture order in a private antitrust case.[1]

The complaint in this complicated litigation was filed on June 14, 1966 by Treadway Companies, Inc. (then known as National Bowl-O-Mat Corp.) and ten wholly-owned subsidiaries[2] through which it operated bowling centers throughout the United States. The plaintiffs charged Brunswick Corporation (Brunswick), a manufacturer and distributor of bowling equipment, with: (1) entering into resale price mainte-

---

1. Many of the issues presented herein were before us in June, 1974. We dismissed those appeals because they were taken from orders which were not final. *NBO Indus. Treadway Cos. v. Brunswick Corp.*, 500 F.2d 1400 (3d Cir. 1974) (Nos. 74–1621, 1622); Appeal of Pueblo Bowl-O-Mat, Inc., 500 F.2d 1400 (3d Cir. 1974) (No. 74–1622); *Treadway Cos. v. Brunswick Corp.*, 500 F.2d 1400 (3d Cir. 1974) (No. 73–2010).

2. These subsidiaries were: Pueblo Bowl-O-Mat, Inc., Bowl-O-Mat Paramus Operations, Holiday Bowl-O-Mat, Inc., Saginaw Bowl-O-Mat, Inc., Paradise Bowl-O-Mat, Inc., Muncie Bowl-O-Mat, Inc., Skore Lanes Bowl-O-Mat, Inc., Minneapolis Bowl-O-Mat, Inc., Des Moines Bowl-O-Mat, Inc., and Indianapolis Bowl-O-Mat, Inc.

nance contracts in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (First Claim); (2) monopolizing and attempting to monopolize the business of operating bowling centers in various markets in which Treadway operated competing centers, thus violating § 2 of the Sherman Act, 15 U.S.C. § 2 (Second Claim); and (3) acquiring and operating bowling centers in the Poughkeepsie, New York, Pueblo, Colorado, and Paramus, New Jersey market areas which had the effect of substantially lessening competition or tending to create a monopoly in violation of § 7 of the Clayton Act, 15 U.S.C. § 18 (Third Claim). During a pre-trial conference held on March 6, 1973, the Sherman Act § 1 claim was abandoned. The § 2 Sherman Act claim and the § 7 Clayton Act claim went to trial. The jury returned a verdict in Brunswick's favor on the Sherman Act claim. No appeal has been taken from this determination. However, the jury found in favor of three of the plaintiffs—Pueblo Bowl-O-Mat, Inc., Holiday Bowl-O-Mat, Inc., and Bowl-O-Mat Paramus Operations—on the § 7 Clayton Act claim. Damages were awarded in the following amounts:

(1) Pueblo Bowl-O-Mat, Inc., Pueblo, Colorado $ 964,830

(2) Holiday Bowl-O-Mat, Inc., Poughkeepsie, New York $ 298,800

(3) Bowl-O-Mat Paramus Operations, Paramus, New Jersey $1,094,400

Pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15, the district court trebled each of these awards, and on May 31, 1973 entered judgment on the damage claims for $7,074,090. As a result of Brunswick's post-trial motions, which were in all other respects denied, the district court granted a new trial as to Pueblo Bowl-O-Mat, Inc., unless Pueblo consented to a remittitur of $499,050. *Treadway Cos., Inc. v. Brunswick Corp.,* 364 F.Supp. 316, 326 (D.N.J.1973) (deci-

sion on post-trial motions). Pueblo did consent, and on October 5, 1973 an order was entered reducing Pueblo's treble damage recovery to $2,395,440. Thus the total damage award was $6,575,040. The district court also considered plaintiffs' application for an award of costs and attorney fees. On April 2, 1974 judgment was entered in the district court awarding $428,468 as attorney fees, and $18,509.32 as costs. On September 24, 1974, after the appeals both by plaintiffs and Brunswick from this award were dismissed by this court,[3] the district court entered an order pursuant to Rule 54(b), Fed.R.Civ.P. directing the following: (1) that the May 31, 1973 judgment, and the October 5, 1973 and April 2, 1974 orders, be entered as final; (2) that the entries be made *nunc pro tunc* as of their original dates for the purpose of fixing the time from which interest at the legal rate would accrue; (3) that the entries be made as of September 24, 1974 for the purpose of taking any appeals. The district court retained jurisdiction over the claim for equitable relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26.

Brunswick appeals from the damage award of $6,575,040; from the award of attorney fees and costs; and from the district court's decision awarding interest from the time of the original judgment and order rather than from the time of the Rule 54(b) certification. Brunswick does not dispute the amount of the award of attorney fees and costs assuming the jury verdict is allowed to stand. It contends, however, that if the verdict is set aside the award of fees and costs must also be set aside. Treadway appeals from the calculation of the fee award contending that it was too low.

On November 15, 1974, the district court filed an opinion,[4] and on January 9, 1975 entered a final judgment, pursuant to § 16 of the Clayton Act, enjoining Brunswick from acquiring any existing bowling centers in the Pueblo, Para-

---

3. *See* note 1 *supra.*

4. *Treadway Cos. v. Brunswick Corp.,* 389 F.Supp. 996 (D.N.J.1974).

mus and Poughkeepsie/Wappingers Falls areas and ordering divestiture of centers previously acquired in those areas. Brunswick filed an appeal from this judgment. On February 14, 1975 this court entered an order directing that Brunswick's appeal from the injunction and divestiture judgment (No. 75–1152) be consolidated with Brunswick's other appeal (No. 74–2127) and with plaintiffs' cross-appeal (No. 74–2128).

Brunswick's contentions, listed below in the order in which they shall be considered, present these questions:

(A) *With respect to the jury verdict:*

(1) Does the record establish a prima facie violation of § 7 of the Clayton Act by Brunswick?

(2) Are treble damages pursuant to § 4 of the Clayton Act recoverable by litigants in the plaintiffs' positions solely for a violation of § 7 of the Clayton Act?

(3) Did the court properly instruct the jury as to the elements of a Clayton Act § 7 case?

(4) Was the jury properly instructed on § 4 damages?

(B) *With respect to the injunction and divestiture order:*

(1) Was there evidence in the record sufficient to support the court's finding of a Clayton Act § 7 violation?

(2) Does § 16 of the Clayton Act authorize the entry of a divestiture order, at the insistence of a private litigant, to redress a violation of Clayton Act § 7?

Plaintiffs' main contention on their cross-appeal is that the criteria for fee awards laid down in *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973) and reiterated in *Merola v. Atlantic Richfield Co.*, 493 F.2d 292 (3d Cir. 1974), while properly applied by the district court, have no place in fully litigated antitrust actions. Rather, it is argued that these criteria should be applied only in class action settlements.

Virtually all of the issues before us are of first impression in this circuit and many are of first impression nationally. The antitrust questions arise because of the unique interaction among the Clayton Act § 7 which proscribes acquisitions having an effect which "*may . . . substantially . . . lessen competition, or . . . tend to create a monopoly*" and the private remedy provisions of § 4 and § 16 of the same act. A statutory prohibition aimed neither at existing conspiracies nor restraints, nor at existing or attempted monopolizations, but at incipient tendencies, presents problems of private enforcement not frequently encountered. Indeed this is perhaps the first case in which an award of money damages has been made to a private plaintiff for an alleged violation of § 7. Thus the district court was exploring largely virgin antitrust territory. Certain errors were committed in this new territory which warrant a new trial. Reconsideration of the fee award will be required as well.

## II. THE INDUSTRY BACKGROUND

Brunswick is one of the two largest manufacturers, distributors and financiers of bowling alley equipment in the United States. Its chief competitor is the American Machine and Foundry Company (AMF), a company about equal in size. Prior to 1964 Brunswick supplied the bowling recreation industry with large quantities of equipment such as lanes and automatic pinsetters. Since this equipment required a substantial capital investment Brunswick also financed the equipment on extended secured credit terms. In the early 1960's, however, the bowling recreation industry went into a sharp decline. The plaintiffs attribute this decline to overexpansion in the industry. They blame Brunswick for this overexpansion, claiming that it financed too many centers, and in particular, that it saturated certain areas with facilities so as to make competitive success impossible.

Simultaneously with the decline in the industry there occurred a collection prob-

lem. Defaults on equipment loans became commonplace. Numerous bowling center proprietors were in such hopeless financial straits that it became clear that there was no reasonable prospect of payment. Exercising its chattel security rights, Brunswick made numerous repossessions, and attempted to dispose of the repossessed equipment at discount prices. Such sales, however, did not keep pace with repossessions. Brunswick's efforts to lease repossessed lanes to new independent proprietors proved unsuccessful. Over the years Brunswick had borrowed close to $300 million in order to finance the manufacture and sale of bowling equipment. By late 1964 its receivables were in excess of $400 million of which more than $100 million dollars were over 90 days delinquent. Brunswick was clearly in serious financial difficulty.

In an effort to reverse its deteriorating condition, Brunswick's management decided on a plan. In those cases in which attempts to collect receivables failed, it would repossess the equipment and attempt to sell it in place to third parties. If no sale could be effected Brunswick would then consider operating the failing centers itself if there appeared to be any reasonable prospect that a positive cash flow would result.

In January, 1965 Brunswick formed a Bowling Center Operations Division (BCOD) charged with the responsibility of evaluating centers and operating those which could produce a positive cash flow. This development was disclosed by Brunswick's president to a meeting of the Bowling Proprietors Association, a retail level trade group, in 1965.

Between 1965 and 1972 BCOD evaluated over 600 defaulting centers for possible operation, commenced operating 222 of these, disposed of 11 to third parties, and closed 43 which proved unable to develop a positive cash flow. The highest number operated by Brunswick at any one time was 169. The largest number of centers taken over by Brunswick for operation in any year was 124 in 1965. Of these, centers in three areas are the subject of this appeal. They are Dutchess Lanes in Poughkeepsie, New York, Belmont Lanes in Pueblo, Colorado, and Fair Lawn Lanes, Interstate Lanes, Ten-Pin-on-the-Mall and Lodi Lanes in or near Paramus, New Jersey.

In each of the local retail market areas a Treadway subsidiary operated a bowling center competing for retail customers with the bowling centers taken over by Brunswick. The parties concede that each of these areas, Poughkeepsie, Pueblo, and Paramus, is a separate retail market for recreational bowling. Treadway does not manufacture or distribute bowling equipment or supplies.

The method used by Brunswick in taking over the operation of the six centers in issue was not identical. For our purposes, however, we can generalize. The acquisitions in question were by a major manufacturer of bowling equipment and supplies who took over bowling centers by means of stock or asset purchases. These newly-acquired facilities competed horizontally at the retail level with Treadway facilities and were kept in business by Brunswick when they otherwise would have failed.[5]

We can conclude our background survey of the bowling industry by noting that Brunswick now operates the largest number of retail bowling centers in the United States—167. The next largest retail bowling chain operates only 32 centers, and the rest of the retail market is fragmented among smaller chains and individual operators. It is conceded that the relevant market is local, however, not national. Brunswick's net assets far exceed the net assets of any other chain of bowling centers and it enjoys those additional advantages which accrue from being the manufacturer of the equipment used in its centers.

---

5. By contrast with Brunswick, although AMF undoubtedly suffered from the decline in the bowling recreation industry in the early 1960's it never integrated forward into the retail end of the business so as to be in competition with its actual or potential customers.

### III. SUMMARY OF PLAINTIFFS' § 7 THEORY

This case involves a "deep pocket" manufacturer's decision to integrate vertically forward into local retail markets and to compete with smaller competitors having shallower pockets. The jury verdict in favor of Brunswick on the Sherman Act § 2 claim establishes that this forward integration was not done in an attempt to monopolize the local retail bowling market. Plaintiffs contend, however, that the entry of such a competitor into these markets had the potential for lessening horizontal competition and that such potential lessening of competition suffices to establish a § 7 violation. It is therefore argued that Brunswick's presence in these markets was illegal, and that plaintiffs suffered damages within the meaning of § 4. These damages were suffered, it is suggested, because in the absence of that illegal presence the acquired centers would have gone out of business thus effectively transferring customers to Treadway's centers.

### IV. WAS A PRIMA FACIE VIOLATION OF § 7 ESTABLISHED?

A. *The potential effect on competition.*

█ This case does not present the classic § 7 problem of a merger with, or a purchase of assets from, a competitor on the same competitive level. Nevertheless, Brunswick's acquisitions had two aspects of possible significance for § 7 purposes. First, Brunswick was a major manufacturer integrating vertically forward into its customer market. Second, it was a giant entering local markets inhabited by pygmies. While both factors may have significance for purposes of § 7, in this case the first factor standing alone is not significant.

A major vice of vertical combinations is market foreclosure to competing manufacturers. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 323–24, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). But in the bowling industry there is only insubstantial continuous distribution from manufacturer to retailer. The principal products of the manufacturing end of the industry—pinsetters and alleys—are one-shot affairs, and the sales of these products by Brunswick had already taken place long before their reacquisition. It cannot be said, and it has not been shown, that AMF suffered or was likely to suffer any market foreclosure as a result of those reacquisitions. Moreover, Treadway is neither an actual nor a potential competitor at the manufacturing level, and hence is not a potential market foreclosure victim. Thus it probably lacks standing to assert the manufacturer's market foreclosure issue. In any event, manufacturer's market foreclosure is not the theory Treadway advances.

The second characteristic of the acquisition, however, is its potential effect on retail level competition. The entry of a giant into a market of pygmies certainly suggests the possibility of a lessening of horizontal retail competition. This is because such a new entrant has greater ease of entry into the market, can accomplish cost-savings by investing in new equipment, can resort to low or below cost sales to sustain itself against competition for a longer period, and can obtain more favorable credit terms. There is evidence from which the jury could have found that several of these factors applied to Brunswick's acquisitions in the Poughkeepsie, Paramus and Pueblo markets. Treadway urges that this evidence suffices to sustain the verdict that there was a § 7 violation. Brunswick, on the other hand, argues that there must be a showing of actual lessening of competition before the jury can find such a violation. We think, however, that Brunswick's argument confuses the showing which must be made to sustain recovery under § 4 with that which must be made to show a § 7 violation.

Three § 7 cases suggest that there was sufficient evidence here to go to the jury on the theory that Brunswick's entry into a local retail market both created the possibility of substantially lessening

horizontal retail competition and tended toward the creation of a retail monopoly. Although these cases arose in three different merger contexts, they all involved the potential effect of mergers on horizontal competition.

*Brown Shoe Co. v. United States, supra,* involved a merger in which a major shoe manufacturer and retailer (Brown) acquired another retailer (Kinney). Thus, the merger had both vertical and horizontal aspects. First, the Court held that the vertical aspect of the merger—Brown's acquisition of a retailer—had potential market foreclosing effects for competing manufacturers and thus violated § 7. Second, the Court held that the Brown-Kinney combination had a potential for substantially lessening competition at the retail level. This conclusion was reached even though Brown and Kinney, in combination, controlled but a small percentage of the retail shoe market, and even though Brown and Kinney had competed in only a small fraction of the geographic markets before the merger. It is true that since they did compete at retail, at least in a fraction of the geographic markets, the combination fits the classic § 7 pattern of a merger of competitors at the same level. But the significance of *Brown Shoe* lies less in that fact than in the Court's analysis of the probable effect of the merger on horizontal retail competition. Brown and Kinney in combination controlled only a small percentage of the retail shoe market. Yet, the Court declined to look at the mere quantitative substantiality of the resulting concentration. Instead it looked at qualitative substantiality. Among the qualitative factors which it mentioned were: (1) the fragmented nature of the retail industry; (2) the ability of a strong national chain to insulate selected outlets from the vagaries of local competition in selected locations; (3) the style leadership of the large chains and its effect on competitors' inventories; (4) the ability of an integrated manufacturer-retailer to eliminate wholesalers by increasing the volume of its retail purchases from its man-

ufacturing division; and (5) the historical tendency toward concentration in the industry. 370 U.S. at 344–45, 82 S.Ct. 1502. Finally, the court perceived in § 7 a congressional intention to protect small competitors even at the short run expense of consumers. It wrote:

"[E]xpansion is not rendered unlawful by the mere fact that small independent stores may be adversely affected. It is competition, not competitors, which the Act protects. But we cannot fail to recognize Congress' desire to promote competition through the protection of viable, small, locally owned businesses. Congress appreciated that occasional higher costs and prices might result from the maintenance of fragmented industries and markets. It resolved these competing considerations in favor of decentralization. We must give effect to that decision." 370 U.S. at 344, 82 S.Ct. at 1534.

Of the major qualitative substantiality factors referred to in *Brown Shoe* there is evidence in this case tending to show that at least four may have been operative in the retail bowling recreation industry: a fragmented industry, the ability of a strong national chain to insulate itself from competitive vagaries in a local market, Brunswick's promotional (style) leadership, and, after the debacle of the early 1960's, the tendency toward concentration. This is not to suggest that the evidence on any such factor was undisputed.

The qualitative substantiality approach of *Brown Shoe* pointed out rather clearly that although Brown and Kinney were retail competitors this factor was not of crucial significance for purposes of § 7. Many of the factors could result from the vertical integration of a pygmy into a giant in any wholesale or retail market. Shortly after *Brown Shoe* Chief Justice (then Judge) Burger so read the case. *Reynolds Metals Co. v. FTC,* 114 U.S.App.D.C. 2, 309 F.2d 223 (1962). There a manufacturer of aluminum, Reynolds, acquired its customer, Arrow,

a converter of aluminum into florist foil. The florist foil conversion industry was a line of commerce which consisted of approximately eight competitors who sold to 700 wholesale florist outlets. The District of Columbia Circuit refused to set aside an FTC order requiring divestiture. The court held, on the authority of *Brown Shoe*, that Arrow's assimilation into Reynolds' enormous capital structure and resources gave it an immediate advantage over its competitors. This advantage might have had the effect of substantially lessening competition or might have tended to create a monopoly.[6]

■ In 1967 the Supreme Court made explicit what had been implicit in *Brown Shoe*—that a merger or acquisition fell within § 7 even though the acquiring corporation and the acquired one were not competitors and even though the transaction did not involve potential market foreclosure of suppliers. In *FTC v. Procter & Gamble Co.,* 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967), it affirmed an FTC determination that Procter & Gamble's acquisition of Clorox Chemical Company in a "product extension" merger violated § 7. Horizontal competition in the household bleach market was threatened, the Court concluded, because Clorox, already a dominant force in that market, would have the benefit of Procter & Gamble's advertising discounts, retailing distribution network, and deep pocket. New entrants into the bleach market might be discouraged, active competition might be inhibited by fear of retaliation from so strong a force, below cost sales might be financed by Procter & Gamble's deep pocket.

The marketing of household bleach is, of course, only remotely comparable to the marketing of recreational bowling. But the Court's analysis in *Procter & Gamble* shows that Chief Justice Burger's reading of *Brown Shoe* was correct. In some industries the acquisition of a competitor by a deep pocket parent can have sufficient potential to harm horizontal competitors so as to violate § 7. There was sufficient evidence of such potential here to submit the case to the jury on the issue of effect on competitors.

B. *The "in commerce" requirement.*

■ Section 7 applies when a corporation "engaged in commerce" acquires the stock or assets of "another corporation engaged also in commerce." At the time this case was tried, the Third Circuit was committed to the proposition that the Clayton Act § 7, like §§ 1 and 2 of the Sherman Act, represented an exercise of Congress' full powers under the commerce clause. In *Transamerica Corp. v. Board of Governors,* 206 F.2d 163, 166 (3d Cir.), *cert. denied,* 346 U.S. 901, 74 S.Ct. 225, 98 L.Ed. 401 (1953), Judge Maris wrote that Congress, in enacting

---

6. Chief Justice (then Judge) Burger wrote:

"When Arrow was vertically integrated through the Reynolds' acquisition, one minor anti-competitive effect foreseeable was the exclusion of other manufacturers of raw foil (Reynolds' competitors) from selling to approximately 33% of the florist foil converting industry. However, neither the examiner nor the Commission rested their conclusions that Sec. 7 had been violated on this basis, nor should we. The truer picture of anti-competitive effect emerges from even the most cursory consideration of the post-acquisition competitive postures of the eight previously independent florist foil converters *vis a vis* one another. Arrow's assimilation into Reynolds' enormous capital structure and resources gave Arrow an immediate advantage over its competitors who were contending for a share of the market for florist foil. The power of the "deep pocket" or "rich parent" for one of the florist foil suppliers in a competitive group where previously no company was very large and all were relatively small opened the possibility and power to sell at prices approximating cost or below and thus to undercut and ravage the less affluent competition. The Commission is not required to establish that the Reynolds' acquisition of Arrow did in fact have anti-competitive consequences. It is sufficient if the Commission shows the acquisition had the capacity or potentiality to lessen competition. That such a potential emerged from the combination of Reynolds and Arrow was enough to bring it within Sec. 7." 309 F.2d at 229–30 (footnote omitted).

§ 7, intended "to exercise its power under the commerce clause of the Constitution to the fullest extent."

Had the district court been possessed of perfect foresight, it would have foreseen a major development in § 7 law that was just over the horizon. In *United States v. American Building Maintenance Industries*, 422 U.S. 271, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975), the Supreme Court considered the jurisdictional reach of § 7.[7] It concluded that unlike §§ 1 and 2 of the Sherman Act, § 7 did not encompass the whole of the commerce power. Effectively, *Transamerica Corp. v. Board of Governors, supra,* had been overruled. The Supreme Court wrote:

"In sum, neither the legislative history nor the remedial purpose of § 7 of the Clayton Act, as amended and re-enacted in 1950, supports an expansion of the scope of § 7 beyond that defined by its express language. Accordingly, we hold that the phrase 'engaged in commerce' as used in § 7 of the Clayton Act means engaged in the flow of interstate commerce, and was not intended to reach all corporations engaged in activities subject to the federal commerce power." 422 U.S. at 283, 95 S.Ct. at 2157.

Applying this new standard to the record before us is a problem of no little difficulty. In fact, had the district court granted a motion to dismiss at the close of the plaintiffs' case, on the ground that the new § 7 threshold had not been met, we might have been inclined to affirm that decision. There was, however, some evidence in the record to suggest that at least some of the acquired bowling centers may have made purchases of pins, pinsetter parts and perhaps other supplies, directly from Brunswick, rather than from local distributors. Thus, they arguably were engaged "in the flow of interstate commerce" within the meaning of the new § 7 test. We think it would be unjust, given the intervening change in the law, to find that the evidence presented was insufficient to cross the jurisdictional threshold and thus order that the district court dismiss the case. We think it more appropriate, consistent with the way in which we will ultimately dispose of the case, to have the "in commerce" question relitigated, with the plaintiffs' being given an opportunity to satisfy the new and more stringent jurisdictional test. See 28 U.S.C. § 2106.

## V. DOES § 4 PROVIDE A PRIVATE REMEDY FOR THIS § 7 VIOLATION?

Until the Supreme Court read the first paragraph of § 7 disjunctively in the *du Pont* cases[8] so that it covered not only the horizontal acquisition of a competitor, but also acquisitions of non-competitors, the possibility of private recovery for a § 7 violation was remote. *Du Pont* involved a § 7 violation resulting from du Pont's acquisition of a 23% stock interest in General Motors, a company to which du Pont supplied paint and fabric. Subsequently, minority stockholders of General Motors brought a derivative action against du Pont seeking (1) § 4 damages from du Pont for the § 7 violation found in the government case, (2) damages for violations of §§ 1 and 2 of the Sherman Act, and (3) damages for a breach of a common law fiduciary duty. In an interlocutory decision, the district court held that since § 7 violations involved potential restraints or monopolizations such violations could not support recoveries under § 4 for injuries to business or property.[9] The case proceeded to

7. It had refused expressly to decide the question in *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 202, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974).

8. *United States v. E. I. du Pont de Nemours & Co.,* 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); *id.,* 366 U.S. 316, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961).

9. *Gottesman v. General Motors Corp.,* 221 F.Supp. 488 (S.D.N.Y.1963), *leave to appeal denied,* (2d Cir. Jan. 31, 1964), *cert. denied,* 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88 (1964).

trial on the Sherman Act and fiduciary duty claims and resulted in a judgment for du Pont.[10] On appeal from this final judgment the Second Circuit reversed the earlier interlocutory holding that a § 7 violation could not be the basis for a § 4 recovery. *Gottesman v. General Motors Corp.,* 414 F.2d 956 (2d Cir. 1969). (*Gottesman I*). Judge Feinberg's opinion required, in effect, that the plaintiff show (1) a violation of § 7, (2) an actual injury causally connected to the violation, and (3) damages of a reasonably certain amount flowing from the causally connected injury. The § 7 violation in the *du Pont-General Motors* case was the potential market foreclosing effect of du Pont's 23% ownership of a large customer for automotive fabrics and finishes. The great significance of *Gottesman I* was that it did not hold that only those foreclosed from the General Motors market could recover. General Motors itself, which was not in the fabrics and finishes business, could recover as well. The Second Circuit remanded to the district court for a reconsideration of the evidence in the light of this interpretation of the interaction between § 7 and § 4.

On remand, the district court again held for du Pont.[11] When appealed, the Second Circuit, in an opinion by Judge Maris, affirmed. *Gottesman v. General Motors Corp.,* 436 F.2d 1205 (2d Cir.), *cert. denied* 403 U.S. 911, 91 S.Ct. 2208, 29 L.Ed.2d 689 (1971) (*Gottesman II*). It is in this latter opinion that the Second Circuit fully considered the damage issue. Damages were not awarded because General Motors stockholders did not prove that the company paid a higher price to du Pont for fabric and finishes than was charged to other du Pont customers and did not prove that the materials in question could have been purchased on the open market, at lower prices, with equal quality and service. Plaintiffs did not prove, in other words, that General Motors' business or property had been injured.

Brunswick and Treadway attach diametrically opposed significance to *Gottesman I* and *II*. Brunswick's theory is that there can be a § 4 recovery only if there is an actual foreclosure of competitors or an actual lessening of competition which results in injury. That approach may work in a situation such as *du Pont-General Motors* where the § 7 violation depends upon the potential for market foreclosure. A party losing foreclosed sales might then recover lost profits, and the foreclosed customer, such as General Motors, might recover overcharges. But when the § 7 violation depends upon the potential injury to a horizontal competitor at the same level as the acquired company, Brunswick's approach would virtually preclude recovery by the competitor until he has been driven out of business.

Brunswick also focuses on the "substantially to lessen competition" language of § 7 and urges that no recovery can be had when activity in the marketplace has the effect of preserving a competitor and reducing consumer prices. But to focus on short run beneficial effects on consumer prices is to disregard the disjunctive "or tend to create a monopoly" clause in § 7, and to confuse injury to the public with injury to competitors. The public is not injured while a potential monopolist is vigorously competing to achieve monopoly power, though that injury may come later. Competitors, on the other hand, are injured in their business or property in a short-run period of predatory competition. Brunswick would permit recovery only when there is an injury to competition (such as market foreclosure) and an injury to the competitor.

Treadway's theory differs from Brunswick's. It argues that if an acquisition is illegal under § 7 because it has a sufficient potential to injure competition or to tend to create a monopoly, then the mere presence of the violator in the mar-

**10.** 279 F.Supp. 361 (S.D.N.Y.1967).

**11.** 310 F.Supp. 1257 (S.D.N.Y.1970).

ket which in fact produces a causally linked injury to the business or property of the competitor suffices for a § 4 recovery. To require more it urges, is to force a private plaintiff to prove a Sherman Act § 1 or § 2 violation and to eliminate private damage recoveries for § 7 violations.[12] Under Treadway's theory it can recover the profits on any sales which it lost by virtue of Brunswick's presence, or any sales which it would have gained in Brunswick's absence.

Treadway's interpretation of the interaction between § 7 and § 4 obviously has far-reaching ramifications. Nevertheless we believe it to be more consistent with the purposes of § 7 to hold that illegal presence which causes injury to the business or property of a competitor is compensable under § 4. This is not to say that proof of a § 7 violation will permit every competitor of the acquired company to recover automatically. As can be seen from *Gottesman II,* the proof of causal connection and of damage still is formidable.

■■ We hold, then, that a horizontal competitor of a company acquired by a deep pocket parent in violation of § 7 can recover damages under § 4 if it shows injury in fact causally related to the violator's presence in the market, whether or not that injury flows from or results in an actual lessening of competition. In this case there was sufficient evidence to go to the jury on the fact of such injury, although as we indicate hereafter there are difficulties with the manner in which the issue was framed in the court's charge.

## VI. DID THE COURT PROPERLY CHARGE A § 7 VIOLATION?

### A. *The impact on competition.*

■ In presenting the case to the jury the district court first charged on the Sherman Act § 2 aspects on which, as we pointed out above, there was a verdict for Brunswick. The court then turned to the § 7 count, explaining that there were three elements involved in determining whether Brunswick violated that section: (1) the relevant lines of commerce, (2) the relevant geographic markets, and (3) "the likely anticompetitive effects of the acquisition of bowling centers in the relevant local market." (4 App. at 2268a). The court then indicated that there were three relevant geographic markets for bowling center operations, and continued:

"You must decide whether the effect of the acquisition of bowling centers by Brunswick may be substantially to lessen competition or tend to create a monopoly in that 'line of commerce' and 'section of the country.'

The determination of this question will establish whether or not this acquisition was a violation of Section 7 of the Clayton Act.

This determination must be made in light of several factors: the primary index of legality is the market share of the acquired and acquiring companies and the extent of concentration in the industry.

An acquisition which produces a firm controlling and undue percentage of the relevant market and resulting in a significant increase in concentration is presumptively unlawful, unless

12. In *Gottesman I* the Second Circuit wrote: "The basis of the pre-trial ruling was that a section 7 violation can cause no damage because it establishes only that harm was threatened, not that it occurred. But if the threat ripens into reality we do not see why there can never be a private cause of action for damages. . . ." 414 F.2d at 961. Referring to this language, two prominent commentators have noted:
"It becomes readily apparent that if the plaintiff has to establish that the threatened harm (probable restraint or monopolization) has ripened into reality, he, in effect, has the burden of establishing an actual restraint or actual monopolization. Thus, the practical effect might be to transform into an action based on §§ 1 and 2 of the Sherman Act a suit based on § 7 of the Clayton Act." Kintner & Wilberding, Enforcement of the Merger Laws By Private Party Litigation, 47 Ind. L.J. 293, 312 (1972).

the defendants can overcome this presumption by other evidence to establish the vigor of competition or affirmative justifications in support of the acquisition.

While market shares are not determinative of legality of an acquisition, I instruct you that high market shares and significant increases in concentration may be sufficient in itself to establish a violation of Section 7. Section 7 of the Clayton Act may be violated either by showing a reasonable probability of a substantial lessening of competition in the future or by showing a substantial lessening of competition which has already occurred." (4 App. at 2269a–70a).[13]

This charge, in the context of the acquisition of retail outlets in relatively small geographic markets, was virtually a directed verdict. Without highlighting other factors, it emphasized the market share held by Brunswick in each of the markets in question, after the acquisitions.

The charge was defective in a number of ways. It did not say, for example, that the jury must consider such factors as the relative financial strength of Brunswick, Treadway, and other competitors. This would have been significant, for although Brunswick was many times larger than Treadway, the latter was still a large public company, and in the bowling recreation industry there are practical limitations on the extent to which capital may be utilized for competitive advantage. Nor did the charge say that the jury must find that Brunswick's position as an equipment manufacturer or equipment financier gave it any retail market advantage.[14] Certainly if the vertical integration forward had this effect the jury could have found a tendency toward monopolization or the potential for a substantial lessening of competition. The jury also was not asked to take into account the historical

13. Referring later to specific acquisitions the court reiterated its emphasis on quantitative substantiality:

"Although no precise figure exists to measure the extent of the market which must be occupied in order for competition substantially to be lessened by an acquisition, I charge you that any percentage of the market achieved by Brunswick in the Pueblo area beyond an insubstantial amount, say beyond 10 to 15%, may be sufficient for you to conclude that competition has substantially been lessened. Consequently, you properly may conclude that Brunswick by the acquisition of Belmont Lanes violated Section 7 of the Clayton Act because Brunswick through that acquisition obtained allegedly more than 20% of the Pueblo, Colorado, bowling center market." (4 App. at 2317a–18a).

"Although no precise figure exists to measure the extent of the market which must be occupied in order for competition substantially to be lessened by an acquisition, I charge you that any percentage of the market achieved by Brunswick in the Poughkeepsie area beyond an insubstantial amount, say beyond 10 to 15 per cent, may be sufficient for you to infer that competition has substantially been lessened.

Consequently, you may properly conclude that Brunswick by the acquisition of Dutchess Lanes violated Section 7 of the Clayton Act because Brunswick through that acquisition obtained more than 20 per cent of the Poughkeepsie, New York bowling center market." (4 App. at 2319a–20a).

"Although no precise figure exists to measure the extent of the market which must be occupied in order for competition substantially to be lessened by an acquisition, I charge you than any percentage of the market achieved by Brunswick in the Paramus area beyond an insubstantial amount, say beyond 10 to 15 per cent, may be sufficient for you to infer that competition has substantially been lessened.

Consequently, you may properly conclude that Brunswick by the acquisition of Interstate, Fair Lawn, Ten Pin Lanes and Lodi Lanes violated Section 7 of the Clayton Act because Brunswick through those acquisitions obtained allegedly 39 per cent of the Paramus, New Jersey, bowling center market." (4 App. at 2320a–21a).

14. As to Brunswick's position as a manufacturer and financier, the district court repeated the following charge with respect to each of the three markets in dispute:

"You may consider that Brunswick describes itself as 'Number One in Bowling' and is the largest manufacturer of bowling supplies and equipment as well as being the banker for its bowling center customers." (4 App. at 2317a, 2319a, 2320a).

tendency in the industry toward concentration or lack of such a tendency.

█ By emphasizing the quantitative substantiality of the market shares held by Brunswick, to the exclusion of other factors, the court failed to draw the jury's attention to the indicators of qualitative substantiality referred to in *Brown Shoe Co. v. United States, supra, Reynolds Metals Co. v. FTC, supra* and *FTC v. Procter & Gamble Co., supra.* While the quantitative substantiality of the market shares is important in a case involving a merger of horizontal competitors, it is far less important here because Brunswick was not previously in any of the three markets. Brunswick's entry into the picture did not increase concentration, but only acted as a substitution of competitors.

Treadway would have us overlook the deficiencies in the § 7 charge because extensive "deep pocket" evidence was introduced on the Sherman Act § 2 claim and the jury was instructed as to the relevancy of that evidence to that claim. There are two obstacles here. First, the court in its instructions quite clearly treated the two counts separately, and we must assume that the jury understood as much. Second, because of the verdict in Brunswick's favor on the Sherman Act § 2 count we cannot speculate as to how the jury evaluated the "deep pocket" evidence.

Because the § 7 charge was inappropriate to the only theory upon which a § 7 violation could in the circumstances of this case be predicated, a new trial is required.

### B. *The commerce requirement.*

The district court charged:

"Each of these plaintiffs, to be entitled to prevail on its claim under Section 7 of the Clayton Act, must prove . . . . :

First, that the assets acquired by the defendant were acquired from a corporation engaged in interstate commerce." (4 App. at 2342a).

Elsewhere, however, the court had charged:

"The undisputed evidence shows that Brunswick acquired Belmont Lanes in April 1965. As a matter of law this was an acquisition in a line of commerce, the operation of bowling centers, in a section of the country, namely, the Pueblo, Colorado, metropolitan area." (4 App. at 2317a).

It gave almost the identical instruction with respect to the Poughkeepsie acquisition. (4 App. at 2319a).

Brunswick contends (1) that the charge is internally inconsistent and (2) that the specific reference to the acquisitions being in a line of commerce amounted to a directed verdict on the interstate commerce issue. We think, however, that in the first quotation the court refers to the "engaged in commerce" requirement, while in the second, it refers to the "in any line of commerce in any section of the country" requirement. Certainly bowling centers are in a line of commerce in a section of the country, although arguably they are only engaged in local rather than interstate commerce.

The interstate commerce charge is cryptic but we need not comment on it any further. When the case is retried, the district court will have to apply the new § 7 interstate commerce test laid down in *United States v. American Building Maintenance Industries, supra.* See Part IV B, *supra.*

### VII. WAS THE JURY PROPERLY INSTRUCTED ON § 4 DAMAGES?

█ We have already held that a horizontal competitor injured in its business or property by the presence in the market of a § 7 violator can recover under § 4. Treadway had the burden under § 4 of establishing the fact of such injury, the proximate causal relationship of that injury to Brunswick's presence in the market, and the amount of damage suffered.

To meet this burden the only evidence offered by plaintiffs was the expert

opinions of several witnesses as to what profits the Treadway bowling centers would have made if Brunswick, instead of acquiring the centers, had permitted them to close.

The court charged:

"Plaintiffs' witnesses ·Kenney, Mendelson, Davis, Lieblich and Gonzalez, all were qualified as expert witnesses. They were entitled to give their opinion as to profits which the plaintiff bowling centers would have made but for defendant's violations of law. These witnesses estimated the amount of business which would have come to plaintiffs' bowling centers if Brunswick had not operated a competitive center or had permitted it to close down in the normal course. . . .

Although there was some differences in amount, these witnesses mutually corroborated each other both in the methods used in determining damages and in general estimates as to the extent of damages. I instruct you that if you believe any one of Messrs. Kenney, Mendelson, Davis, Lieblich and Gonzalez was telling the truth, then you must believe that all were telling the truth since they mutually corroborated each other and since there was no contradictory evidence offered by Brunswick as to extent of damages, except that the defendant denies that the plaintiffs are entitled to any damages.

. . . You may disregard this testimony as to damages only if you find all these witnesses, Messrs. Kenney, Mendelson, Davis, Lieblich and Gonzalez, were discredited or impeached by contradictory evidence. I instruct you

that if you find that the antitrust laws have been violated and that plaintiffs' corporations have been injured thereby, then you must also find damages in the amounts falling within the range as indicated by the testimony and exhibits, apart from any determination you may make as to those damages related to Fort Lauderdale and to plaintiffs' various interest expenses." (4 App. at 2326a–27a).

■ The court then reviewed the damage testimony. The thrust of this instruction, indeed the thrust of plaintiffs' § 4 theory, was that damages were to be computed by first assuming that each Brunswick-acquired center would have closed down at the moment of the takeover, but for the takeover and then by projecting what portion of the closed center's business would have been captured by Treadway's centers. However, since plaintiffs' § 7 theory was based on the presence of the violator, Brunswick, in the market, the jury should have been determining what plaintiffs' profits would have been if the violations had *never* occurred. In other words, the jury should have first been instructed to find whether the acquired centers would, in fact, have gone out of business, rather than being taken over by someone else or continuing in business by extensions of credit. Such a finding was a prerequisite to establishing any proximate causal relationship between the § 7 violation and the only evidence of injury to business or property which was presented.

The inadequacy of the § 4 charge is brought into sharp relief by the court's instruction on the so-called "failing company" defense.[15] Since the jury rejected

15. The court charged:

"A company is not a failing company merely because it is experiencing financial difficulties or temporary losses.

To qualify under the failing company doctrine, the resources of the acquired business must be so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure.

The 'failing company' defense, therefore, is a very restricted one. The acquiring company must show that the acquired company

faced the grave probability of business failure, and that it was the only available buyer.

And it must show that there was no prospect for reorganizing the company which was acquired.

If some of the centers which Brunswick acquired were not failing, and if operators other than Brunswick could and would have acquired the centers in question, the doctrine does not apply." (4 App. at 2321a–22a).

this defense with respect to each of the acquired centers, it must have concluded that none of the centers would inevitably have gone out of business. In the § 7 context the failing company defense was a matter on which the defendant. Brunswick had the burden of proof. But in the § 4 context plaintiffs had the burden of proving an injury to their property or business proximately related to the violation. The effect of the damage charge was to relieve them of that burden and permit the jury to award damages on a theory which assumed an essential fact on which no finding was made.

■ The damage charge was defective in another respect. The court referred to the testimony of Treadway's witnesses estimating the amount of business which would have come to the Treadway Centers had the acquired centers closed down and to an exhibit recapitulating that testimony. Next it noted that Brunswick had not offered evidence on the damage question, and charged

> "I instruct you that if you find the antitrust laws have been violated and that the plaintiffs' corporations have been injured thereby, then you must also find damages in the amounts falling within the range as indicated by the testimony and exhibits. . . . " (4 App. at 2327a).

This was error, for it is clear that a trier of fact is at liberty within the bounds of reason to reject in whole or in part the uncontradicted testimony of a witness which does not convince the trier of its merit. This rule applies on the issue of damages as on any factual issue. *Rhoades, Inc. v. United Air Lines, Inc.,* 340 F.2d 481, 485 (3d Cir. 1965).

Even if the § 7 charge had been entirely proper we would award a new trial because of the § 4 instruction.

■ Brunswick would have us hold that the jury's rejection of the failing company defense means that the only factual premise upon which plaintiffs' § 4 injury to property or business theory may be predicated has been decided against it, and that Brunswick should have judgment rather than a new trial. But the jury may only have decided that Brunswick had not established the defense by a preponderance of the evidence, and probably did not consider whether in order to find a § 4 injury it had to find that the acquired centers would have closed. Since there is evidence from which the jury might have found that the centers would have closed, a new trial with proper instructions is appropriate.

## VIII. THE § 16 RELIEF

### A. *The district court's finding of a § 7 violation.*

■ Based upon the same evidence presented to the jury the district court concluded that the violation of § 7 warranted injunctive relief pursuant to the Clayton Act § 16. In doing so it rejected Brunswick's argument that the favorable verdict on the Sherman Act § 2 attempt to monopolize count established its beneficent intentions, and that no relief should be awarded on the assumption that the acquisitions might "tend to create a monopoly." It requested the court to make specific findings of misconduct as a predicate for specific injunctive relief. To some extent the court did so, but it is clear that an essential predicate for the decision was that the jury verdict established Brunswick's unlawful presence in the market.[16]

---

16. The district court stated:
 "In fashioning this remedy, I find it necessary to expressly state the factual basis on which I shall make my ruling. Although I have specifically made findings concerning the anti-competitive practices utilized by the defendant in causing the plaintiffs' injury, I

also find in the alternative that the factual presence of the defendant in this market is sufficient to prompt the equitable intervention of this Court. In so finding, I adhere to the argument advanced by the plaintiffs that actual anti-competitive effects, let alone the causal mechanisms by which they were in-

Since this is so, and since we are granting a new trial on the § 7–§ 4 aspects of the case, we conclude that the § 16 order must also be set aside. We are obliged, of course, to review the district court's findings of fact by a different standard. But with clear indications of the court's reliance on the jury's verdict, a verdict which we have concluded is tainted by erroneous legal instructions, we think the § 16 relief must also be reconsidered after a new trial.

### B. *The divestiture order.*

Since we are granting a new trial the district court may again be asked to consider whether divestiture is a remedy available to a private plaintiff under § 16 of the Clayton Act. The authorities on that issue differ.[17] Until the Ninth Circuit's recent opinion in *International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp.,* 518 F.2d 913 (9th Cir. 1975), no court had made any real effort to analyze the problem in terms of congressional intention. The Ninth Circuit opinion makes an exhaustive analysis of the available legislative history and concludes, learned commentary to the contrary notwithstanding,[18] that Congress did not intend to create a private divestiture remedy when it en-

acted the injunctive relief provision of § 16.

No third Circuit opinion enlightens us on this problem. We have independently reviewed the available legislative history referred to in Judge Goodwin's extended opinion in *International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp., supra.* We agree that it supports his conclusion that many members of the Senate and House Committees which considered the problem in the Sixty-third Congress assumed that § 16 did not create a private divestiture remedy. We will not burden this opinion with a repetition of Judge Goodwin's analysis.

It is quite another question whether legislative history from 1914, strong as it appears, should control the contemporary application of a statute laying down a fundamental national economic policy. This is especially true when the significance of the circumstances to which application is sought were perceived dimly, if at all, at the time of passage. The antitrust laws are of necessity statements of general principle. They must be given meaning in specific applications on a case-by-case basis. It is impossible for a legislature to devise codes so all-encompassing as to predict every case to

duced, are not necessary precedents to finding a violation of Clayton Section 7 nor to ordering equitable relief.

. . . The very fact of the jury's finding, unless it was so erroneous as to demand a judgment n. o. v. which I have previously denied, is sufficient to support my present decision to order injunctive relief." 389 F.Supp. at 1000–01.

17. Cases declining to grant a private divestiture remedy include: *International Tel. & Tel. Corp. v. General Tel. & Electronics Corp.,* 518 F.2d 913 (9th Cir. 1975); *Continental Sec. Co. v. Michigan Cent. R. R.,* 16 F.2d 378 (6th Cir. 1926), *cert. denied,* 274 U.S. 741, 47 S.Ct. 587, 71 L.Ed. 1320 (1927); *American Commercial Barge Line Co. v. Eastern Gas & Fuel Associates,* 204 F.Supp. 451 (S.D.Ohio 1962); *Graves v. Cambria Steel Co.,* 298 F. 761 (S.D.N.Y. 1924) (L. Hand, J.); *Venner v. Pennsylvania Steel Co.,* 250 F. 292 (D.N.J.1918).

Cases suggesting the availability of a private divestiture remedy include: *International Tel. & Tel. Corp. v. General Tel. & Electronics*

*Corp.,* 351 F.Supp. 1153, 1203–11 (D.Hawaii 1972) and *Calnetics Corp. v. Volkswagen of America, Inc.,* 348 F.Supp. 606, 614–17 (C.D. Cal.1972), both of which are reversed on the issue by *International Tel. & Tel. Corp. v. General Tel. & Electronics Corp., supra; Credit Bureau Reports, Inc. v. Retail Credit Co.,* 358 F.Supp. 780 (S.D.Tex.1971), *aff'd,* 476 F.2d 989 (5th Cir. 1973); *Bay Guardian Co. v. Chronicle Publishing Co.,* 340 F.Supp. 76 (N.D.Cal.1972); *Burkhead v. Phillips Petroleum Co.,* 308 F.Supp. 120 (N.D.Cal.1970); *Julius M. Ames Co. v. Bostitch, Inc.,* 240 F.Supp. 521 (S.D.N.Y. 1965); *Bailey's Bakery, Ltd. v. Continental Baking Co.,* 235 F.Supp. 705 (D.Hawaii 1964), *aff'd per curiam,* 401 F.2d 182 (9th Cir. 1968), *cert. denied,* 393 U.S. 1086, 89 S.Ct. 874, 21 L.Ed.2d 779 (1969).

18. Note, Availability of Divestiture in Private Litigation as a Remedy for Violation of Section 7 of the Clayton Act, 49 Minn.L.Rev. 267 (1964).

which the general principle should apply. So, too, with antitrust remedies. There is a danger in permitting the pronouncements of statesmen long deceased to control the contemporary meaning of statutes which are almost an economic constitution for our complex national economy.

But we need not, in this case, decide a rule of general application with respect to the availability of divestiture relief under § 16. Even if such a private remedy is available, it would in our view be inappropriate because less drastic relief will provide sufficient redress.

It must be recalled that we are dealing with three specific geographic markets, and thus with three separate problems of relief. The focus of the remedy, then, must be on what can be accomplished to overcome the threat to competition in those specific markets. If the suit had been commenced at a time when the court might have prevented the acquisitions by Brunswick or any other deep pocket owner, and if it had done so, one of two things might have happened. Brunswick might have allowed the bowling centers to close, and would thereby have eliminated any § 4 injury to plaintiffs' property or business. Alternatively, Brunswick might have found another purchaser whose presence in the market would have retained the same level of competition. The injury to Treadway's property or business at least on this record would have been the same, but there would have been no § 7 violation on which to predicate either a § 4 or a § 16 action. At this late stage, ten years after the acquisition, divestiture of going, thriving bowling centers to other purchasers will not change the competitive picture. By now the formerly threatened businesses have survived.

 An alternative to a sale, of course, would be to dismantle the centers. But at this time such a procedure would merely reduce competition artificially in the three markets to the detriment of the public. If this had been a merger between competitors so that its effect would almost inevitably have been anticompetitive, divestiture, if authorized, might have been appropriate. But where the § 7 violation is by a new entrant purchasing an existing competitor in an existing market, relief should be restricted to preventing those practices by which a deep pocket market entrant harms competition. Otherwise what is intended as a shield for small competitors becomes a sword against the consumer. Given the type of § 7 violation which plaintiffs alleged and attempted to prove, divestiture was simply inappropriate.

## IX. ATTORNEY FEES AND COSTS

 Since we are granting a new trial on the treble damage claim, the award of attorney fees and costs must also be set aside.[19] But since the district court may be faced with the question of attorney fees after a new trial, it is appropriate to consider plaintiffs' contention that the principles of *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp., supra,* are applicable only to class actions and not to litigated antitrust cases. The district court properly understood the *Lindy Brothers* holding. It laid down principles of general application for the award of attorney fees. There is no exception for litigated antitrust cases. If a new award is made the court should be guided by the principles of *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp., supra; and Merola v. Atlantic Richfield Co., supra.*

## CONCLUSION

The judgments appealed from in Nos. 74–2127 and 75–1152 will be reversed and the case remanded for further proceedings in accordance with this opinion.

19. *DeFilippo v. Ford Motor Co.*, 516 F.2d 1313, 1321 (3d Cir. 1975); *Byram Concretanks, Inc. v. Warren Concrete Products Co.*, 374 F.2d 649, 651 (3d Cir. 1967) (attorney fees not recoverable in absence of treble damage award).